1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                        WACO DIVISION

4   AMERICAN PATENTS, LLC        *
                                 *
5                                *
    VS.                          * CIVIL ACTION NO. W-18-CV-339
6                                *
    MEDIATEK, INC, ET AL         *    September 20, 2019

7
        BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
8                       STATUS CONFERENCE

9   APPEARANCES:

10  For the Plaintiff:

11                      Stafford Grigsby Helm Davis, Esq.
                        The Stafford Davis Firm, PC
12                      102 North College Avenue, 13th Floor
                        Tyler, TX 75702
13
                        Larry D. Thompson, Esq.
14                      Zachariah Harrington, Esq.
                        Antonelli, Harrington & Thompson LLP
15                      4306 Yoakum Blvd., Suite 450
                        Houston, TX 77006
16
    For the non Lenovo Defendants:
17
                        Tyler T. VanHoutan, Esq.
18                      Eric Stephen Schlichter, Esq.
                        McGuire Woods LLP
19                      600 Travis Street, Suite 7500
                        Houston, TX 77002
20
         (By phone)    Rebecca Levinson, Esq.
21                      McGuire Woods LLP
                        2001 K Street N.W., Suite 400
22                      Washington, DC 20006-1040

23
         (By phone)    Paige Arnette Amstutz, Esq.
24                      Scott, Douglass & McConnico, LLP
                        303 Colorado Street, Suite 2400
25                      Austin, TX 78701

```
 1       (By phone)      Kevin Anderson, Esq.
                         Duane Morris, LLP
 2                       505 9th Street, N.W., Suite 1000
                         Washington, DC 20004-2166
 3
                         Gilbert Andrew Greene, Esq.
 4                       Duane Morris LLP
                         900 S. Capital of Texas Highway, Suite 300
 5                       Austin, TX 78746

 6       (By phone)      Alexander B. Englehart, Esq.
                         John S. Kern, Esq.
 7       (By phone)      Eric W. Schweibenz, Esq.
                         Oblon, McClelland, Maier & Neustadt, L.L.P.
 8                       1940 Duke Street
                         Alexandria, VA 22314
 9
                         Jonah D. Mitchell, Esq.
10                       Reed Smith LLP
                         101 Second Street, Suite 1800
11                       San Francisco, CA 94105

12
      For the Lenovo Defendants:
13
         (By phone)      Lai L. Yip, Esq.
14                       Sheppard, Mullin, Richter & Hampton LLP
                         Four Embarcadero Center, 17th Floor
15                       San Francisco, CA 94111

16                       Debra E. Gunter, Esq.
                         Findlay Craft, P.C.
17                       102 North College Ave., Suite 900
                         Tyler, TX 75702
18
      Court Reporter:    Kristie M. Davis
19                       United States District Court
                         PO Box 20994
20                       Waco, Texas 76702-0994

21

22       Proceedings recorded by mechanical stenography, transcript

23   produced by computer-aided transcription.

24

25
```

1          (September 20, 2019, 8:56 a.m.)

2          THE COURT:  Okay.  Good morning, everyone.  Welcome.

3          (Off-the-record discussion.)

4          THE COURT:  Who's going to be speaking on behalf of

5    plaintiffs mostly?

6          MR. HARRINGTON:  Your Honor, Zach Harrington will be --

7    myself will be discussing the protective order issues and Larry

8    Thompson will be discussing the discovery issues.

9          THE COURT:  Okay.  Why don't -- Mr. Harrington, why don't

10   we have you come up here and stand near the phone?

11         Who's going to be on behalf of --

12         MR. VANHOUTAN:  Tyler VanHoutan, Your Honor, on behalf of

13   the non Lenovo defendants.

14         THE COURT:  Okay.  Why don't you come and stand up here?

15         Okay.  So this will be a little awkward I guess, but I

16   want to make sure everyone can hear.  And, Mr. Harrington,

17   you're here for the plaintiff American Patents?

18         MR. HARRINGTON:  Yes, Your Honor.  Zach Harrington.

19         THE COURT:  And, Mr. VanHoutan, you're going to be

20   speaking on behalf of all the defendants?

21         MR. VANHOUTAN:  I am.  I'm only representing the non

22   Lenovo defendants, but I'll be speaking on behalf of all

23   defendants today.

24         THE COURT:  With regard to the protective order?

25         MR. VANHOUTAN:  Yes.

1        THE COURT:  Okay.  So if you want, it probably would be --

2   let me see how we did this.  I'm happy for you all to go

3   through -- give me one second here.

4        Why don't we take up -- Josh, do you -- should we take up

5   the source code first, do you think?

6        LAW CLERK:  Yes.

7        THE COURT:  Okay.  Why don't we take up -- and,

8   Mr. Harrington, you can tell me what you want to do with the

9   source code, including what we're going to do with third party

10  source code and then I'll let Mr. VanHoutan say what they'd

11  like to have.

12       MR. HARRINGTON:  Yes, Your Honor.  Zach Harrington on

13  behalf of plaintiffs.  And our belief is right now the

14  defendants have not indicated that they have any source code to

15  produce and so at this point we don't think it makes any sense

16  to have source code provisions.  We think that the standard

17  protective order from this Court provides that if -- that once

18  defendants do decide, if they actually do, that they have

19  source code, then we can deal with that source code in the

20  particular source code.  In this case we don't know if the

21  source code is open source code from defendants.  We don't know

22  if it's open source from ARM.  They've made no indication

23  whatsoever.  They've made no particularized showing.  They

24  would be required to do that in order to have the provisions.

25  The standard provisions that they have are not the standard

1  provisions.  The provisions they have about source code have --

2  are very, very specific.  They have page limits.  They have all

3  sorts of particulars, and in order to have those kind of

4  restrictions and have any kind of intelligent discussion about

5  that, we need to know what the source code is in order to

6  determine if any of the -- what they've asked for is reasonable

7  or not.

8      THE COURT:  Okay.  Mr. VanHoutan, do you -- we think, we

9  being the Court, think there's a likelihood there will be

10 source code.  You know, ARM source code or something.

11     That's A-R-M source code.

12     Or something else.  Do you anticipate there's going to be

13 source code?

14     MR. VANHOUTAN:  We do, Your Honor.  Now that we're sort of

15 getting into the claim construction process, defendants are

16 fairly confident that we're going to be producing and relying

17 on source code to prove noninfringement and we also think the

18 source code of third parties like ARM is going to be relevant

19 in this case and we think that's going to be produced, and

20 therefore we think that source code provisions are necessary.

21 We think the source code provisions that we proposed -- I'll

22 say they're sort of battle tested on behalf of defendants.  You

23 know, we've used these before.  They set out a nice, clear

24 structure for what you can and cannot do with source code

25 because the last thing that we want to do is have some source

1    code provisions that don't touch everything, that don't tell

2    the parties what they can and cannot do and then we have a

3    dispute and then we've got to come back to Your Honor and we

4    want to avoid that.  So we think it's better for everybody if

5    we put in the protective order now source code provisions and

6    they're very clear about what parties can and cannot do, how

7    you resolve disputes and therefore we can just get this case

8    going rather than come back to Your Honor with every little

9    problem.

10         THE COURT:  And I believe I have your -- by your I mean

11   the defendants' proposed protective order that I'm working off

12   of and I believe it's on Page 16, Paragraph 12 that we're

13   working; is that right?

14         MR. VANHOUTAN:  Yes, Your Honor.  Of Document No. 140,

15   Exhibit A, Paragraph -- or excuse me.  Page 16 starting at

16   Paragraph 12.

17         THE COURT:  Okay.  And who is going to be speaking on

18   behalf of Lenovo?

19         MS. YIP:  Your Honor, this is Lai Yip speaking.  Although

20   Mr. VanHoutan is representing the non Lenovo defendants, he's

21   speaking on the Lenovo defendants' behalf as far as the

22   protective order dispute is concerned.

23         THE COURT:  Okay.  So if -- just because you're not here

24   and I want to protect y'all's rights, if for some reason one of

25   these two gentlemen say something and you want to add something

7

1   in, please be sure to, you know, jump in.  I'm going to assume

2   Mr. VanHoutan is speaking on y'all's behalf as well unless you

3   let me know otherwise.

4        So, Mr. Harrington, I think we're going to have a source

5   code -- we are going to have source code provisions.  Which

6   sections of the source code provisions do you object to having

7   that the defendants have proposed?

8        MR. HARRINGTON:  So the very first part we object to is

9   the definition of source code.

10       THE COURT:  Okay.

11       MR. HARRINGTON:  The defendants have attempted to say that

12  source code would be not only source code but other technical

13  documents that somehow reflect source code.  That obviously

14  could almost be anything technical.  We think that's

15  inappropriate.  If there is going to be a source code

16  provision, it should only be actual source code.  There's no

17  justification whatsoever for other technical documents to be

18  considered source code.  For example, chip level schematics.

19       THE COURT:  Okay.

20       MR. HARRINGTON:  Or things that reflect source code.  We

21  also object to --

22       THE COURT:  Let me ask for just one second.  Mr.

23  VanHoutan, is the -- are the additional -- is what

24  Mr. Harrington is describing as additional, are they stored in

25  the same way or are those separate documents?

1      MR. VANHOUTAN:  They will be made available for inspection

2  and produced in the same way.  So the chip level schematics are

3  essentially the blueprints for the making of a chip.  You know,

4  if those were to be -- say, end up in China, for example,

5  someone could manufacture, literally could manufacture the

6  chip, and that's why we've included chip level schematics in

7  the -- under the protections of the source code provisions

8  because they will be, number one, produced the same way.  They

9  should be handled the same way and they're the same sort of

10  high level confidential information that needs to be -- that

11  needs added protections.

12      THE COURT:  And, Mr. Harrington, is there any reason to

13  believe that there would be a different person from y'all's

14  side, a different expert -- it seems to me it would be the same

15  expert who'll be looking at all this stuff at one time.  And so

16  if we have them protected in the same manner, as long as the

17  experts have access to them, what problems are you caused by

18  that?

19      MR. HARRINGTON:  So my concern is that source code and

20  chip level schematics are generally stored differently in

21  different ways and I think the defendants should have to --

22  because if the chip level schematics are, for example,

23  something from ARM that are shared regularly through an FTP

24  site with their customers, there's no reason we should have to

25  go to a specific source code room to review those.  Going to a

1    source code room to review documents is extremely onerous on

2    us, on our expert, and we should only have to do it for the

3    documents where it's absolutely necessary and where the

4    defendants have shown that there's -- these things aren't

5    publicly available or they're not made available in much easier

6    methods.

7          THE COURT:  So are the chip level schematics derived

8    directly from the source code?

9          MR. VANHOUTAN:  In a roundabout way, yes.  I mean, if the

10   source code is RTL describing a hardware, then those chip level

11   schematics are going to be derived from that RTL.  And with

12   regard to his comments about ARM, ARM doesn't manufacture chip

13   level -- they don't manufacture products.  They don't have chip

14   level schematics.  These are from defendants and so these will

15   be produced along with the source code.  And regarding the

16   comment on the review rooms, I do know that Qualcomm has a

17   procedure where instead of outside counsel's office they

18   produce their source code at one place which is a third party

19   vendor that is a repository for the review and production of

20   source code.  And, you know, I mean, I don't see that as any

21   more burdensome than to going outside of counsel's office.

22         THE COURT:  Mr. Harrington, if I were to -- if I were to

23   restrict your access -- your expert's access only to source

24   code or chip level schematics or whatever that are maintained

25   by any of the defendants in a manner that is -- where, as you

1    suggested is highly confidential and we made that clear, would

2    that -- in the protective order, would that take care of your

3    concern?

4        MR. HARRINGTON:  That would take care of a large part of

5    the concern.  What I really don't want to have happen is for

6    them to give me technical documents that are e-mailed back and

7    forth between people or in other ways -- they may still be

8    confidential in the company but they're not treated like source

9    code.  They're not treated like high level schematics and

10   because they, quote, unquote, "reflect" that information,

11   somehow I now have to go and look at those documents in a

12   closed room without -- you know, with all the other onerous

13   provisions that they have in here which I haven't gotten to

14   yet.

15       THE COURT:  Well, let me say this.  What my intent will

16   be, and hopefully we'll be able to get this right, but what my

17   intent will be with regard to the provision of source code by

18   the defendants to your expert is your expert will not -- you

19   will not be treated any different -- your access to the highly

20   confidential material will not be any different than they treat

21   any other third party.  So if they maintain their -- if they

22   maintain their source code in a highly secretive manner and do

23   not distribute it in any way and want to require you to go to a

24   secure facility because that's the way they maintain it for

25   themselves, that's fine with me.  If you're able -- and I'm

1  going to have Mr. VanHoutan represent this for everybody, but

2  if the -- I'll just pick on Mediatek because they're the first

3  defendant in the list.  If Mediatek does not maintain strict

4  security over their -- any of their confidential information,

5  then you should have the same ability to access it as the way

6  they treat it with any third party.

7      MR. HARRINGTON:  That's fair, Your Honor.

8      THE COURT:  Under the terms of y'all's expert isn't to

9  share it either, but they -- I will require your expert to have

10 the same level of -- they get the same level of confidentiality

11 on everything they have that they treat the third -- outside

12 world too.

13     MR. HARRINGTON:  For example, like a customer or somebody

14 under an NDA.

15     THE COURT:  If a customer gets it under an NDA, then your

16 expert can get it in whatever form or however they send it to

17 third parties.

18     MR. HARRINGTON:  That's eminently fair, Your Honor.

19     THE COURT:  Is that -- and, Mr. VanHoutan, are you okay

20 with that?

21     MR. VANHOUTAN:  Possibly, Your Honor.  I'm somewhat

22 concerned just because I don't know under what situations that

23 customers might provide the designs of products and source code

24 to, for example, Mediatek, and if it's through a secure

25 customer portal, that's not a way that you could actually

1  review source code and then identify what portions of the

2  source code you want printed.  So the source code provisions

3  are, you know, a manner of putting the source code in a place

4  and in a format where plaintiffs, probably experts, can review

5  it, identify what they want out of there, tell us what they

6  want, we review it, we make sure that we agree, print it out

7  and then produce it to them.  And then after that, it's -- it

8  tells them, you know, how they deal with that source code.  So

9  if a customer, for example, ARM, has a confidential customer

10  portal that they give source code to Mediatek, that doesn't

11  really allow plaintiff's expert -- you can't review it that

12  way.  That's just a transport.  So I guess I wanted to make

13  that distinction because if Mr. Harrington said, well, look.

14  ARM provides to Mediatek source code via this portal so we want

15  access to it via this portal.  Well, the source code's huge and

16  it's -- you know, it's not something that we can really allow

17  the whole thing to go into a litigation.  We just want to have

18  the portions that are relevant to this litigation and the

19  allegations be part of the record.  So I guess that's the only

20  distinction that I wanted to draw for Your Honor.

21      MR. HARRINGTON:  Your Honor, I think that Mr. VanHoutan

22  just brought up a couple of good points.  You know, we -- the

23  issue I see is they're somehow going to treat us differently

24  than they would treat a customer and --

25      THE COURT:  Well, that's actually -- that's fair.  What

1   I'm trying to do is I just -- I want to make sure that what

2   I'm -- what I'm trying to balance here is I want to make sure

3   you all have access and -- but the access is to the source

4   code.  I don't see any -- I've never been involved in a case,

5   and I wasn't ever the technical person but I was pretty close

6   to it.  I was never involved in a case where ultimately the

7   expert for the plaintiff didn't have to go somewhere and review

8   the source code.  I never was involved in a case that --

9   sometimes -- I mean, we had people sometimes come to my law

10  office and it was a secure site.  We had someone like Josh Yi

11  sitting there while they did that or in the next room or

12  however we did it.  But, I mean, y'all -- your expert is

13  different than a customer.  I mean, that is -- it's not exactly

14  the same thing.  I'm just trying to -- what I'm -- and so on

15  source code I think you're going to have to deal with -- I want

16  you to have the least inconvenient way to review the source

17  code you can, but I'm going to protect their source code.  It's

18  really these other -- what I'm more worried about are the

19  peripheral documents that I think there may be an exchange and

20  I don't want y'all to be any more burdened than Dell would be

21  or some other third party would be in terms of access to them

22  just because they're confidential but they're not -- you can't

23  go and make a product out of them.  It's just -- it's stuff

24  would be confidential.  So with regard to source code, I'm

25  going to pretty much allow the defendants -- as long as it's a

1  reasonable way of producing the source code to your experts --

2  they've got to leave the air-conditioning on and they've got to

3  give you a comfortable chair and all that stuff, but -- you

4  know, and provide water and all that, but I'm going to defer to

5  the defendants as long as they make -- what I also want though

6  is to allow you all to access and take from that review as much

7  as you need to prove your case.  And that's the balance I'm

8  trying to strike here.  And so tell me, Mr. Harrington, how I

9  accomplish that from your side and then I'll let Mr. VanHoutan

10 tell me why you're wrong.

11     (Laughter.)

12     THE COURT:  And we'll keep trying to work through this.

13     MR. HARRINGTON:  So that's fair, Your Honor.

14     So I think that again what Mr. VanHoutan said the process

15 that they're contemplating I think is not a process that we've

16 had a lot of success with and that we think is a fair process.

17 So under their protective order what they've asked for is we go

18 to the source code room and we've reviewed the source code.

19 Then we say, hey.  These are the pages we want printed.  Then

20 they go, review those source code pages, decide whether they

21 think that's fair or not and then if they choose that they

22 think that's fair, they'll go ahead and they'll print, you

23 know, I think up to ten pages or some arbitrary limit of source

24 code pages.  Several judges have -- in the past have rejected

25 arbitrary page limits like that.  I think that's -- you know,

1   it's unfair.  Until we know what the source code is, it's

2   random and unfair to say you can -- how many pages you can --

3        THE COURT:  Okay.  Well, let's stick right now with --

4   let's break this down into parts.

5        MR. HARRINGTON:  Okay.

6        THE COURT:  In terms of -- I think it's fair for you to

7   have to go to someplace like they're suggesting, whether it's

8   Qualcomm or whatever else.  Are you -- are you okay with doing

9   that?

10        MR. HARRINGTON:  Yes, Your Honor.  Sorry.

11        THE COURT:  No.  No.  No.  I'm not being very articulate.

12   So -- and by the way --

13        MR. HARRINGTON:  For the source code, just to be clear.

14        THE COURT:  Right.  And just for the source code.  And but

15   also if -- and we may -- this may sort of run into, if you're

16   going to be there for that anyway, then I may want you to

17   review the chip level schematics at the same place to

18   protect -- have the same amount of security for them.  I'm more

19   concerned with making sure you have the ability to take away

20   from it what you need.  And so you're okay with the suggestion

21   of the defendants on how it will be produced to you?

22        MR. HARRINGTON:  Yes, Your Honor.  I think -- well,

23   being -- going to a particular place, but I don't believe that

24   having to send whatever we want to be printed --

25        THE COURT:  I'm not there yet.

1      MR. HARRINGTON:  Okay.

2      THE COURT:  I'm just saying are you okay with it being

3  produced in the manner they're suggesting?

4      MR. HARRINGTON:  Yes, Your Honor, as long as --

5      THE COURT:  It being available.

6      MR. HARRINGTON:  As long as these are things they do not

7  send out via e-mail to the customers or provide on a portal to

8  20 different customers because I don't think that's -- if they

9  can give it to 20 customers on a portal, I think it's fair that

10  we should be able to get -- it's -- that's really not the kind

11  of high level crown jewels that these source code provisions

12  are meant to protect.

13      THE COURT:  Well, I'm good with you going there.  Now,

14  tell me how it is that you -- with regard to the stuff that

15  they consider, as you said, the crown jewels I think is a good

16  way of saying it, source code, chip -- you know, the schematic,

17  something where you could take it and make it yourself, that

18  would be bad.  Then -- and again I've been in your position

19  asking for this stuff and I've been in his position not wanting

20  to give it.  So I'm not biased here in either side.  I've lost

21  in both -- on -- I've actually lost arguing both sides.  So

22  but -- so tell me what you want in terms of me giving you

23  access to using the source code now and see if we can come to

24  an agreement on that.

25      MR. HARRINGTON:  So the best method that I've done for

1   source code review has been where there's a source code room.

2   There's pre-Bates labeled printed pages and our expert prints

3   out as much source code as he thinks he needs in order to prove

4   our case, the excerpts and whatever, you know, the portions

5   that he thinks he needs to line up.

6       THE COURT:  Okay.  Let me stop you there.

7       Is that something you all would be willing to do?

8       MR. VANHOUTAN:  I do it a little differently and I think

9   it works better.

10      THE COURT:  Okay.

11      MR. VANHOUTAN:  We basically have an electronic folder

12  where the expert would put into the folder the pages that he

13  wants to ultimately print off and then we review that folder.

14  We being the defendants produce --

15      THE COURT:  Okay.  I'm just trying to -- we're just at

16  the -- what he -- what they want and then we'll decide what to

17  do about what you get to review.  So your method is,

18  Mr. Harrington?

19      MR. HARRINGTON:  We print out -- our expert prints out

20  whatever pages he thinks is necessary and then we tell them

21  what -- we can either copy those or we can tell them what that

22  source code is and then our expert when he's done at the end of

23  the day takes the source code with him.

24      THE COURT:  Okay.  And so, Mr. --

25      MR. HARRINGTON:  Excerpts.

1      THE COURT:  Okay.  So Mr. VanHoutan's is the electronic

2  equivalent of instead of it being printed out, it goes into an

3  electric -- some notebook format that's on a computer, but

4  you're -- basically both of you are preserving the same

5  sections of source code that the expert wants, correct?

6      MR. HARRINGTON:  Yes, Your Honor.

7      MR. VANHOUTAN:  If I may, Your Honor, yeah.  The reason we

8  do it that way is because the whole point of sort of

9  limitations is to prevent a party from taking things with them

10 to review at home, if you were.  You have to come to the source

11 code review room.  You have to review the source code on the

12 source code computer.

13     THE COURT:  Right.

14     MR. VANHOUTAN:  And then you have to print out what you

15 want or identify what you want printed and then it's printed

16 and given to you and you go.  So if you select hundreds of

17 pages of source code, that's sort of presumptively too broad,

18 meaning that you're not reviewing the source code on the source

19 code computer like you're supposed to and only taking what you

20 need which eliminates or reduces the risk of inadvertent

21 disclosure or use.  You're taking a huge swath of it and you're

22 walking out.

23     THE COURT:  Okay.

24     MR. VANHOUTAN:  So what we do is we put it in this interim

25 folder.  Producing party reviews, say, yeah.  It's good.  Then

1    you print it out on the Bates labeled pages so you don't have

2    any issues with what's being produced and you hand it to the

3    expert or counsel.  We generally -- you know, there's --

4    generally it's like a two or three day period that you have to

5    then give it to the other side.

6            THE COURT:  Okay.  And how -- and, Mr. Harrington, how are

7    you damaged by giving them -- giving the defendants an

8    opportunity to in essence review and object to certain

9    portions -- certain -- it's going to be limited amounts they

10   can object to.  So how -- if it were -- if I were to limit them

11   to two days to do that, how are you injured by that?

12           MR. HARRINGTON:  So a lot of times this is -- I've had

13   this dispute a number of times, and what happens is the

14   defendants take the source code.  They're busy and so they

15   don't get a chance to look at it, and a lot of times when

16   you're doing source code, it's at the last minute and you're

17   trying to get it for an expert report.  You're trying to get it

18   for supplemental infringement contentions and it's just --

19   three -- what it -- three days to review and for the defendants

20   to spend, you know, coming up with a dispute is problematic.

21   If there's a dispute, they can -- we can have the source code

22   and they can say, hey, Court, you know, we think that this is

23   too much.  We could do it the day of, but having three days for

24   source code -- any amount of time really is I think unfair.

25   They should not be looking through the source code to try and

1   kind of figure out what our expert is doing in that given day

2   and then, you know, coming up with potential disputes.  So my

3   experience has always been it's much better to have the source

4   code printed.  They could -- you know, if we go through -- if

5   they print 500 pages and they think that's too many, they'll

6   know how many pages we're printing on that given day.  We're

7   willing to keep a log.  We're also willing to have a provision

8   in the source code -- in the source code provision that says

9   we're not going to review it outside -- we're not going to be

10  reviewing it for the first time on the printed page.  We're

11  going to be doing the source code review in the source code

12  room, but I don't think it's fair for them to arbitrarily hold

13  back the source code.

14      MR. VANHOUTAN:  Your Honor, may I respond to that?

15      THE COURT:  Sure.  Of course.

16      MR. VANHOUTAN:  So we're talking about the crown jewels.

17  I mean, plaintiff's counsel said it's appropriate.  These are

18  the crown jewels.  I don't think it's a good idea and it's

19  certainly never anything that I've done where you allow the

20  plaintiff, for example, in this case, the reviewing party to

21  take as many pages as they want that day without the party that

22  owns that information having the ability to object first.

23      THE COURT:  Well, so that -- I may not be -- there are two

24  ways I could take what you're saying.  Let me tell you what I

25  mean is an unlimited amount macro, meaning how much they get

1   overall, or how much they would get of a certain portion.  So

2   if we were to impose a maximum printable page limit, would that

3   help the defendants?

4        MR. VANHOUTAN:  What we proposed is exactly that, a total

5   page number which is presumptively unreasonable.  It can be

6   rebutted and then a --

7        THE COURT:  And what was that number?

8        MR. VANHOUTAN:  50 pages total of source code.  And then

9   we have a continuous block of source code of ten pages.

10        THE COURT:  Okay.

11        MR. VANHOUTAN:  So it's -- that is presumptively

12   unreasonable under the protective order proposed by defendants.

13   If there is a dispute, there's a procedure for the parties to

14   meet and confer, and if they can't meet and confer and resolve

15   the issue amongst themselves, then they bring it to Your Honor.

16   That's rebuttable.  You know, if plaintiff says, I have to have

17   51 pages, number one, we wouldn't fight over 51 pages.

18        THE COURT:  Oh, someone on either side.

19        (Laughter.)

20        MR. VANHOUTAN:  I won't.

21        THE COURT:  Someone -- I have a feeling someone on your

22   side might is my sense.

23        MR. VANHOUTAN:  But if it was 500 pages and they said,

24   here's the specific need for those 500 pages total, you know,

25   we might consider that, and ultimately that's something that

1   Your Honor could decide is reasonable, given the facts of the

2   case.  It's just the guidelines to set forth what happens

3   without having to come to Your Honor for every little issue.

4        MR. HARRINGTON:  Your Honor, I have no idea what the basis

5   for ten pages and 50 pages comes from.

6        THE COURT:  It's just the lowest number they thought they

7   could get me to go with.

8        (Laughter.)

9        MR. HARRINGTON:  I agree with that, Your Honor.

10        MR. VANHOUTAN:  Your Honor, I'll tell you what the basis

11   is.

12        THE COURT:  Okay.

13        MR. VANHOUTAN:  It's -- we've ruled this out dozens of

14   times.

15        THE COURT:  Okay.

16        MR. VANHOUTAN:  It's been battle tested.  It works.  I've

17   never had a situation where the party has come to me and said

18   50 pages total or ten continuous pages is not enough.  We need

19   more.

20        MR. HARRINGTON:  Your Honor, I'm 100 percent sure that

21   this -- that we would need more than ten pages and 50 pages in

22   this case.  There's 600 products, over 600 products at issue in

23   this case.  There -- the idea that we're going to be able to do

24   source code review for one of the defendants for -- and ten

25   pages and 50 pages I don't think is fair or reasonable.  It's

1   not been my experience in source code review that you're able

2   to do --

3       THE COURT:  I'm thinking, Mr. Harrington, of 500 pages

4   cumulative and 25 pages contiguous.

5       MR. HARRINGTON:  I think the 500 pages if it was on a per

6   product basis, I think that would be fine.  I don't know.  Some

7   of the products may share source code, but there are several

8   versions and there's -- later on you're going to hear a dispute

9   about the various versions, and so I think on a per product

10  basis 500 pages in my experience is probably going to be fine.

11      THE COURT:  And how many products?

12      MR. HARRINGTON:  Well, so we don't know what -- how many

13  products have the same source code and how many have -- so it'd

14  be products that have the same source code.  So per version of

15  source code that we have to review.  If the defendants say,

16  hey.  You need to do the source code review on a product per

17  product basis, you know, we would have to do that, and if

18  there's different source code, we would have to point to the

19  different source code for each one of those versions.

20      THE COURT:  And what about 25 contiguous pages?

21      MR. HARRINGTON:  I think that 25 contiguous pages is --

22  can be hard because of all the -- again, it's -- I think that's

23  a little bit arbitrary.

24      THE COURT:  It's entirely arbitrary.

25      MR. HARRINGTON:  If it was 100 pages --

1    THE COURT:  No matter what I pick is going to be entirely

2  arbitrary.

3    MR. HARRINGTON:  I think 100 pages is -- I'd be

4  comfortable saying we're not going to go over 100 pages, but 25

5  pages is -- I mean, that -- there can be, you know, two

6  subroutines that are 25 pages just by themselves and they just

7  may happen to be back to back and those are the ones we need.

8    MR. VANHOUTAN:  Your Honor, may I respond?

9    THE COURT:  Of course.

10    MR. VANHOUTAN:  I think that's an extreme number, given

11  what we're talking about in source code.  I mean, they haven't

12  accused every functionality of this microprocessor or of the

13  microprocessors of infringing.  They've accused a small part.

14  I think under the numbers that you proposed, it's extremely

15  large and they could probably print off everything that they --

16  everything that exists for that -- for the accused

17  functionality.  I think 100 pages total and 20 continuous is

18  more appropriate.  And, look.  If we get in a situation where

19  the plaintiff tells us they need more, and I've represented to

20  you that this is sufficient, I'm going to have that

21  conversation and be very reasonable with them.  I'm not going

22  to be hard nosed about it and then come here and have you tell

23  me, you know, Mr. VanHoutan, you said that this was sufficient.

24  So I think that's a good starting point.  I mean, they --

25  they're trying to accuse 620 some products.  So 500 pages a

1    product, 25 continuous lines a product, that's a tremendous

2    amount of source code that's hanging out there and the crown

3    jewel is at risk I guess.

4         MR. HARRINGTON:  Again, I said crown jewel.  I don't think

5    that they've in any way showed that these are the crown jewels.

6    That was just a -- something the defendants have said.  500

7    pages is a limit that I've seen in several protective orders

8    where this has been a dispute.  I think that's fair.  I've been

9    involved in several source code reviews in which the number of

10   pages of source code has come close -- per version has come

11   close to 500 pages.  For example, I was involved in a case

12   involving Android which is public -- mostly publicly available,

13   but, you know, there's -- I think it's 14,000, 15,000 pages of

14   Android source code.  I don't know.  He's saying that 500 pages

15   is going to be some decent portion of their product.  I don't

16   believe that's going to be true.  I think that if you look at

17   the total product, the source code is going to be -- my guess

18   is it's going to be in the thousands of pages.  Unless he has a

19   particular -- Mr. VanHoutan has a particularized understanding

20   of the source code they're going to produce, which so far we've

21   been told they don't have any particular source code they are

22   going to produce at this point.  I don't know how he can make

23   that statement.

24        THE COURT:  Okay.  Here's what I'm going to do.  I'm going

25   to limit it to 250 pages total per product if they are

26

1   different -- have different source code and 25 pages of

2   contiguous, but here's something else.  We will be -- the Court

3   will be available when your -- and I'm going to give the

4   defendants -- I'm going to go with the defendants' methodology

5   of putting them on some electronic manner and they'll have two

6   days to review.  What that means is you guys need to schedule

7   the source code review not the day before -- like I have

8   another case where I'm -- they're already in trouble because

9   it's -- they're fighting over who gets to look at the source

10  code review the day before everything's due.  That's the wrong

11  time to come to me.  I mean, it's fine.  You can come to me

12  whenever, but I can't help much.  For the defendants, if you

13  are going to withhold information, I want you both to know that

14  we're available by phone, and if -- and so if the defendant --

15  if any of the defendants wants to withhold something from

16  production and you the plaintiff feel like you need it, you

17  just need to call and I can resolve -- I can resolve that

18  within a day.

19       MR. HARRINGTON:  Your Honor, is that two days for us to

20  actually get the source code?

21       THE COURT:  Two days for them to review it and then at the

22  end of the -- by the end of two days if they have decided that

23  they want to withhold something, the next day you call me and I

24  will decide whether or not they can withhold it and they'll

25  have it to you that next day.

1     MR. VANHOUTAN:  One more clarification.  I'm sorry, Your

2  Honor.  Two business days?  Just in case it's a Friday and --

3     MR. HARRINGTON:  Your Honor, I'd request two regular days

4  because --

5     THE COURT:  I would schedule it on a Wednesday that you do

6  it.  And so the two days will end on a Friday and you can call

7  me and I'll be available by the Monday.  But I will -- the

8  point here is that I want you to be -- you plaintiff to be

9  reasonable in what you're asking for.  I want the defendants to

10 be reasonable in what they're -- intend to withhold knowing

11 that if either of you is unreasonable, I'm going to be involved

12 immediately in getting it worked out.  And so my way of -- this

13 isn't like I'm going to scream at people for not getting along.

14 It's that hopefully if you both know that there is nothing to

15 be gained by delay and fighting over whether it's produced or

16 not because I'm going to be available to say whether it has to

17 be produced.  I find people get along much better in that

18 regard knowing that there's no benefit from delay.

19     And my brilliant law clerk wants me -- I hope I'm going to

20 get this question correct.

21     By product, Mr. Harrington, are you talking about chips or

22 accused products or what?  I don't want y'all leaving here when

23 I say product and then y'all having a -- not knowing what I

24 meant by product because I'm not sure I know what I mean by

25 product.  So when -- Mr. Harrington, when you say we want the

1   source code per product, let's put down on the record what

2   you're thinking.

3        MR. HARRINGTON:  So per -- yeah.  So it'd be --

4        THE COURT:  Accused product?

5        MR. HARRINGTON:  Per accused product to the extent they're

6   saying there's different source code for those different

7   products.

8        THE COURT:  And in this case are the accused products

9   chips?

10       MR. HARRINGTON:  Yes, Your Honor.

11       THE COURT:  Okay.  So --

12       MR. VANHOUTAN:  So, Your Honor, may I --

13       THE COURT:  Oh, of course.

14       MR. VANHOUTAN:  -- interject?

15       I don't think it's as complicated as Mr. Harrington made

16  it out.  So we've got products that are chips.  That's not

17  really what they're accusing and that's not what they charted.

18  They charted microprocessor cores within those chips and

19  specifically ETM, embedded trace macrocell, versions running on

20  those cores.  What they did was chart one core and then they

21  listed six products --

22       THE COURT:  Okay.

23       MR. VANHOUTAN:  -- that contain that core.  So by product

24  it should be --

25       THE COURT:  Is that -- I'm sorry.  Is that just for your

1   company?

2       MR. VANHOUTAN:  That's for everyone.

3       THE COURT:  Okay.

4       MR. VANHOUTAN:  That's for the non Lenovo defendants.  I

5   don't have insight into how they did Lenovo's.

6       THE COURT:  Okay.

7       MR. HARRINGTON:  It's the same, Your Honor.

8       MR. VANHOUTAN:  So by product we're talking about -- we

9   should be talking about the core, not the six individual chips

10  that all use that core.  Their accused allegations -- their

11  allegations of the accused functionality are all within this

12  core that's in a product.

13      THE COURT:  Okay.  Well, here -- again, I'm not going to

14  restrict what the -- what the -- the plaintiffs need to prove

15  their case.  They need to have access to whatever source code

16  they get access to.  I'm doing my very best to make sure that

17  it's protected and so I'm not going to in advance -- if the

18  plaintiffs say these two products, whatever that means,

19  whatever the plaintiff means by what they're accusing, we need

20  to have -- if they can articulate to me when they say we want

21  it and you say they shouldn't get it, if they -- they need to

22  be prepared to articulate to me, this is -- here's the reason

23  we need this -- this additional -- this isn't in the same

24  bucket of 250 that this is.  It's a different bucket.  If they

25  can't explain to me why it's different, they're not going to

1  get 250 more pages.  On the other hand, I'll speak to

2  Mr. Harrington since he's here.

3      Mr. Harrington, if you can explain to me why you need the

4  extra 250 pages, I'm going to give those to you.  And so y'all

5  will know as you're fighting over this whether or not you think

6  you can persuade me that you're right or not and -- but I

7  will -- but I'll deal with it very quickly.  Y'all will not

8  have any delay on the Court's part in terms of, Mr. Harrington,

9  you getting it once they complete their review and the

10  defendants know that as soon as I hear y'all's arguments

11  they're going to have to -- they'll either be able to protect

12  it or they'll turn it over.  And we'll get it resolved very

13  quickly.  As president Trump would say, it'll be the greatest

14  review ever.

15      (Laughter.)

16      MR. HARRINGTON:  Thank you, Your Honor.

17      THE COURT:  It'll be the review that everyone will be

18  proud of.  America will be proud of the review that we'll do.

19      So is there anything else we need to take up with regard

20  to source code or with regard to the schematics?  Are y'all --

21      MR. HARRINGTON:  Yes, Your Honor.  So --

22      THE COURT:  Okay.  What's that?

23      MR. HARRINGTON:  Another provision that the defendants

24  have in there is they -- no electronic devices, cellular

25  phones, anything else can be brought into the source code room.

1    My experience has been that oftentimes our expert will have a

2    cell phone in order so we can have discussions about any

3    problems they're having and also a laptop that has his -- draft

4    of his expert report so he can be -- as he's doing the review,

5    he can type down his notes and type down, you know, how the --

6    to make it more efficient.  I don't think anybody anymore works

7    by hand.  I mean, very few people are actually -- especially

8    experts are taking notes by hand.  And so we would request that

9    we are allowed to bring a laptop that's not networked and a

10   cell phone so that he can have calls with counsel.

11        MR. VANHOUTAN:  May I respond?

12        THE COURT:  Uh-huh.

13        MR. VANHOUTAN:  That is sort of exactly what we're trying

14   to prevent.  A situation where you've got a pipeline to the

15   outside world from the source code room.  So what we're going

16   to allow them is a breakout room where their expert's cell

17   phone and computer can be and he can walk from the review room

18   over to the break room and call counsel if he has a question or

19   needs to talk to them.  What he can't do is sit in front of a

20   source code computer on the phone with counsel and be reading

21   out and telling him exactly what's on it and/or typing in his

22   computer exactly what he sees on the screen.  That sort of

23   defeats the whole purpose of the source code review and the

24   higher level of protections that we need for that crown jewel.

25   So the --

1      THE COURT:  I'm not really following that because you're

2   going to be giving them that source code and he can -- he's

3   going to -- he can do that anyway.  In fact, he's going to do

4   that in his expert report.  He's -- I mean, it seems to me

5   it's -- it seems to me it defeats the purpose of him reviewing

6   it if he can't make notes while he's in there.  Is there -- I

7   don't know this well enough -- the protective order well

8   enough, but the experts under -- and the lawyers he'll be

9   talking to, for example Mr. Harrington, they're under

10  restrictions in this not to reveal it, right?

11      MR. HARRINGTON:  Yes, Your Honor.

12      MR. VANHOUTAN:  They are, but they also have restrictions

13  of whether they can convert those paper documents, the printed

14  copies to electronic.  If they're already electronic on a

15  computer and who knows what the expert's putting on there in

16  his notes which is -- also should be source code, that then can

17  be transferred electronically.  It's already electronic.  So

18  it's subject to potential hacking or whatever and it can be

19  transmitted electronically.  So that defeats the purpose of the

20  printed documents of source code which there hasn't been any

21  issue with printed documents.  That's what counsel said it

22  wanted.

23      MR. HARRINGTON:  Your Honor, he's impuning my expert's

24  integrity before I even have an expert.  I don't think the

25  expert -- if there's going to be a malfeasance, it can happen

33

1    with or without a laptop.  He could have a photographic memory

2    and memorize everything.  I don't think that preventing our

3    expert -- preventing our expert from using a laptop and a cell

4    phone in any way protects their code extra.  The expert will

5    have had to sign on to the protective order and agree that he's

6    not going to be copying portions of source code into his notes.

7    That doesn't mean that he shouldn't be allowed to write down

8    his analysis and in his laptop.  Really all they're kind of

9    saying is that laptops are more efficient than handwritten

10   notes which is of course why we want our laptop.

11        MR. VANHOUTAN:  Your Honor, if I may.  That takes the

12   source code, and the notes regarding the source code is

13   potentially the source code and turns it into an electronic

14   format and then we have no control over what that electronic

15   format where it goes.

16        THE COURT:  Okay.

17        MR. VANHOUTAN:  Whether that's hacked, whether that's

18   transmitted electronically.

19        MR. HARRINGTON:  That's going to be true whether or not he

20   has a source code computer in the source code room or he has

21   notes.  He can take those notes and type them -- he's going to

22   take those notes and type them into an expert report eventually

23   anyway.

24        MR. VANHOUTAN:  And, Your Honor, just one more comment on

25   the cell phone.

1        THE COURT:  I'm -- you're about to win.  So...

2        MR. VANHOUTAN:  I'll be quiet.

3        THE COURT:  You know, unless you really want to make that

4    point.

5        MR. VANHOUTAN:  Cell phones have cameras.

6        THE COURT:  Okay.  Well, that doesn't in my opinion kind

7    of impune, I mean, because their guy knows he's not supposed to

8    do that, but that being -- so I'm not in any way -- I'm

9    assuming that any expert that wants to keep being an expert is

10   not going to be taking photos.  But I do -- I am going to go

11   with the defendants' suggestion that there be a breakout room

12   where your guy can go to his computer and use the phone.

13       Is there anything else?

14       MR. HARRINGTON:  So he can't bring a laptop into the

15   source code room?

16       THE COURT:  He cannot.  He can take notes.

17       Is there anything else with the defendants' proposed

18   source code section that you want me to take up?

19       MR. HARRINGTON:  I think --

20       THE COURT:  Speak now or forever...

21       MR. HARRINGTON:  I think those are the main issues, Your

22   Honor.

23       THE COURT:  So I think I have this right.  Again, using

24   their format that's on Page 23 that we're going to -- what I

25   would suggest since the defendant has this, I assume

1    electronically, y'all's proposed -- if you can modify your

2    paragraph I believe it's P -- tell me if I'm wrong -- or

3    anywhere else where it's the number of pages, if you will

4    change that to the numbers that I gave you.

5        MR. VANHOUTAN:  It's actually I, Your Honor, where it's

6    talking about the numbers.

7        THE COURT:  I have P also where it's --

8        MR. VANHOUTAN:  P is referencing the number of lines that

9    can be put into a brief.

10       THE COURT:  Okay.  Thank you.

11       MR. HARRINGTON:  We object to that as well, Your Honor.

12       (Laughter.)

13       MR. HARRINGTON:  Obviously.

14       MR. VANHOUTAN:  I'm sorry that I spoke.

15       MR. HARRINGTON:  I mean, that's again completely

16   arbitrary.  25 lines of source code.  It's -- I mean, Your

17   Honor, I think that if the defendants are willing to agree

18   that, you know, that any 25 lines is enough and they're not

19   going to make any objections and say that that's not enough

20   proof, you know, maybe there's -- I mean, if they waive their

21   right to object to what source code we put in, then I think --

22   and that that doesn't meet our standard of proof, I think that

23   maybe that would be fair.

24       THE COURT:  Okay.  Well, what number do you think would be

25   fair, Mr. Harrington?

1      MR. HARRINGTON:  I can't think of any number of lines that

2  would be -- I have no idea until I look at the source code

3  until my expert tells me how many lines he thinks he needs to

4  point to.

5      MR. VANHOUTAN:  Your Honor, can I rebut that?  If he puts

6  25 lines of source code in the brief that he wants you to rule

7  on, is that going to meaningfully move you one way or another?

8  I certainly can't read it.  He's going to tell you what the

9  product does.  Here's what our expert says.  Here's how it

10  functions.  So protecting against putting just line after line

11  of source code in a brief frankly I think is necessary just to

12  prevent it from happening, but I don't think you have to put

13  source code --

14      THE COURT:  Here's what I'm going to do just because it's

15  not -- you know, the juice isn't worth the squeeze here.  I'm

16  leaving in -- Mr. Harrington, in P 25, if you need -- and all

17  that means is if you need to do more than that, then you just

18  need to tell -- call them and say why you need to do more than

19  that, and if they disagree with you doing more than that, then

20  you just call here and say, we need a five minute phone call

21  and you can explain to me why you need to do more than that,

22  and I'm sure if you are persuasive, I'll allow it to happen.

23  And so --

24      MR. HARRINGTON:  So, Your Honor, I mean -- I guess I'm a

25  little -- I don't even really know what 25 lines of source code

1   being allowed in an expert report would look like.

2       THE COURT:  I don't either.  That wasn't ever my job, but

3   if you -- I'm --

4       MR. HARRINGTON:  I can point to an expert report where we

5   just did that had significantly more than 25 lines of source

6   code.  It had thousands of lines of source code.

7       THE COURT:  Well, it seems to me -- and I wasn't ever

8   on -- no one asked me to do the expert -- the technical

9   experts, but it seems to me that you should be able in your

10  expert report to have your expert state where in the source

11  code he's referring and say the following lines in just like a

12  footnote or something and say, this is what -- these are the --

13  Line X to Line Y of source code is what my expert is relying on

14  here, and then the burden will be on the defendants if they

15  don't think that's sufficient to tell them where it's at.  Then

16  they can complain, but it's -- I don't know why you have to put

17  more than 25 lines of the code in the expert report as long as

18  you have a way of referencing it to them and they know what

19  your expert's relying on.

20      MR. HARRINGTON:  I think this would probably be fine as

21  long as they're bound by it as well.  So I think their expert

22  should also not be allowed to put more than 25 --

23      THE COURT:  No.  I'm just going to bind your side.

24      (Laughter.)

25      THE COURT:  Anything I'm doing is bilateral in every

1  situation.

2      MR. HARRINGTON:  So the language they use right now is the

3  receiving party should only be allowed to do it and so I think

4  it should be their expert obviously should not be allowed to.

5      THE COURT:  It is all bilateral.

6      MR. HARRINGTON:  Okay.

7      THE COURT:  There is -- if they --

8      MR. HARRINGTON:  As long as they're bound by it, Your

9  Honor, I can live with it.

10     THE COURT:  I can't imagine why they want to put more than

11  25 lines of their code in an expert report.  They can say, turn

12  to -- I don't know how you do source code.  I wasn't involved

13  in that, but it seems to me their expert can write it down in a

14  way that says, I'm referencing this line to this line of source

15  code, and your guy will know what it means, and if he doesn't

16  know what it means, then call them and find out, and if they

17  won't tell you, then call me and we'll work it out.  So I

18  just -- I don't see any need to have any more than that in the

19  expert report itself when you can reference it through a

20  footnote.  But going back to I, if counsel for the defendants

21  will fix I to the numbers that I've suggested, then I'm going

22  to accept that -- y'all's source code.

23     Is there anything else, Mr. Harrington, you want to -- we

24  need to take up with regard to source code?

25     MR. HARRINGTON:  No, Your Honor.

1      THE COURT:  Okay.  And so just to make clear, I'm going to

2  feel this way when I leave that we've worked out the disputes

3  on source code.  If not, I need to know now.

4      MR. HARRINGTON:  Can I have a second to confer with my

5  colleagues?

6      MR. VANHOUTAN:  May I?

7      THE COURT:  Yes.

8      (Conference between counsel.)

9      MR. HARRINGTON:  Your Honor, although I think generally

10  we're fine with what you said.  I think the only thing I want

11  to make sure is about the -- what we're going to conclude as

12  source code and chip level schematics and the other related.

13  How do you want the parties to deal with that?  I think I have

14  an understanding of what you said.  Do you want us to draft

15  language?

16      THE COURT:  I want -- I want the defendants to draft

17  language that makes clear what they consider to be information

18  that is deserving of the highest level of protection and that

19  they -- and they get that.  If -- with the understanding that

20  I'm making now from what you've discussed that if the

21  information -- I can't imagine what that is -- besides -- we

22  talked about source code and schematics.  If there's some other

23  bucket of information that they want to have treated with an

24  equal level of dignity and they want to put the same

25  restrictions on it, then they need to be able to represent to

1  you and to me that they treat it themselves that way and it's

2  not something that other third parties have any different level

3  of access to.  And so I don't know if there is -- are those

4  buckets or not.

5      MR. HARRINGTON:  Well, they've asked for it so far, Your

6  Honor.

7      THE COURT:  Well, what besides -- what besides source code

8  and schematics?

9      MR. VANHOUTAN:  I don't believe that's accurate, Your

10 Honor.

11     MR. HARRINGTON:  So they've asked for documents that

12 reflect source code or schematics to be treated in that manner

13 and so I think if we deleted that section that says reflect and

14 all it is is the -- we're talking about source code and chip

15 level schematics, then I don't think we have an issue.

16     THE COURT:  Are there any -- are there any documents, Mr.

17 VanHoutan, besides that?

18     MR. VANHOUTAN:  Well --

19     THE COURT:  Source code, schematics and?

20     MR. VANHOUTAN:  Yeah.  The issue would be if they're

21 copying source code in an expert report and they say they need

22 to do 100 lines and they come to you and you say that's okay,

23 then we think that that expert report, at least that portion of

24 it, needs to be treated as source code.

25     THE COURT:  Oh, no.  No.  We're talking about two

1    different things here.  I'm saying with respect to what you --

2    what the defendants get to keep to force their expert to handle

3    in the manner we're saying is source code and schematics, are

4    there any other buckets of information that their expert's

5    going to have to go through the same efforts to review?

6         MR. VANHOUTAN:  No.  In our source code provisions it

7    makes it -- makes clear that source code and chip level

8    schematics of those that apply to that.

9         THE COURT:  Okay.  And that's going to be my -- regardless

10   of what y'all have in the protective order, that's going to be

11   my understanding.  Okay.  I'm going to take him -- on behalf of

12   the defendants, that's the way -- I'm a very simple person and

13   that's the way I'm going to remember it, you know, going

14   forward is that's what's meant by schematics and source code.

15   It's going to be schematics and source code.

16        MR. HARRINGTON:  Thank you, Your Honor.

17        THE COURT:  Okay.  What else do we need to take up with

18   regard -- do we need to take up -- for sure we need to take up

19   prosecution bar, I take it, right?

20        MR. VANHOUTAN:  I believe there's a dispute over that,

21   Your Honor.

22        THE COURT:  Okay.  Would one of you help me to where

23   that's at in the protective order?

24        MR. VANHOUTAN:  In Exhibit B it is -- if you go back to

25   Paragraph 9, Your Honor.  I'm sorry.  Exhibit A.

1      THE COURT:  Paragraph 9?

2      MR. VANHOUTAN:  On Page 8, Paragraph 9.

3      THE COURT:  Okay.  So here's a question that you can

4  certainly tell me you're not going to answer, but it won't help

5  me if you don't.  Are defendants going to file IPRs in the

6  case?

7      MR. VANHOUTAN:  We are considering it.

8      THE COURT:  And do you think -- and is that true for all

9  the Lenovo -- non Lenovo folks?

10      MR. VANHOUTAN:  I can't say, Your Honor.

11      THE COURT:  Okay.  Well, here's the problem is I don't

12  know what to do exactly with regard to participation in IPRs if

13  I don't know if y'all are going to do IPRs.

14      MR. VANHOUTAN:  I can say it's more likely than not, Your

15  Honor.  And I think that's probably consistent with most patent

16  litigations these days.  So I think following that we -- it's

17  more likely than not that we a third party will file an IPR

18  related to the patents-in-suit.

19      THE COURT:  Okay.  So let's take that up first.

20      Mr. Harrington, what do you suggest the requirement be

21  with respect to attorneys if there's going to be an IPR filed?

22      MR. HARRINGTON:  So I guess the first thing I'd like to

23  address is the bilateral or, you know, one way direction.  What

24  the defendants have suggested is that there's a prosecution bar

25  that goes just to the plaintiff.  Not surprisingly, they don't

1    want to be bound by the same provisions that they're suggesting

2    we should be bound by, but there's no logical reason whatsoever

3    that a prosecution a bar would apply to plaintiffs and not

4    defendants.  It's the same -- the whole reason for the

5    prosecution bar is that, you know, the Deutsche Banks set forth

6    this idea that there's certain information that attorneys and

7    experts just can't get out of their head and they can't -- they

8    unintentionally commingle those ideas and then when they're

9    doing prosecution on behalf of that same plaintiff -- same

10   client, then they can mistakenly include -- cover the scope of

11   technical information that they've seen during the technical

12   review.

13       THE COURT:  Let me --

14       MR. HARRINGTON:  That risk is the same with the defense

15   counsel as it is with plaintiffs.  There's no -- their experts

16   aren't somehow different than our experts.  We're going to be

17   looking at the same pool of experts.  So why should our experts

18   be bound in a way that their experts are not bound?

19       THE COURT:  And, Mr. Harrington -- I'm sorry.  Mr.

20   VanHoutan, why would I not make it bilateral?

21       MR. VANHOUTAN:  Your Honor, it's about protecting the

22   disclosure of confidential technical information.  Inadvertent

23   disclosure.  And there's only a one way direction of

24   confidential and technical information in this case.  Plaintiff

25   is a non practicing entity.  They don't have any products.

1   They don't have any sales.  They don't have any confidential

2   technical information.  So there's nothing that we're going to

3   be receiving, and we being defendants, from plaintiff that we

4   could potentially use inadvertently in any sort of prosecution

5   venue, whether it be patent prosecution or IPR.  So that's why

6   a bilateral patent prosecution and IPR bar is appropriate here

7   because there is no risk of disclosure of their information,

8   whereas there's a significant risk of inadvertent disclosure

9   because of all the information that we're going to be giving

10  plaintiff's counsel and plaintiff's experts to say that

11  defendants' experts should be -- have the same burden,

12  defendants' experts are retained by defendants.  They owe

13  obligations to those defendants.  Defendants will deal with

14  their own counsel and experts.  What we can't deal with --

15  defendants can't deal with is plaintiff's counsel and

16  plaintiff's experts.

17        THE COURT:  Yes, sir.

18        MR. HARRINGTON:  Your Honor, I don't understand how they

19  are making a distinction between their experts and our experts.

20  They're saying that somehow contractually they're going to bind

21  their experts to the same prosecution bar?  I'd like to see the

22  prosecution bar that they have in their expert retainer

23  agreement.  I've never seen that before.  I don't think that's

24  fair and I don't think that's what Deutsche Banks says.

25  Deutsche Banks doesn't make a distinction between prosecution

1    done by the plaintiff or prosecution done by the defendant.  I

2    think that -- you know, additionally we're talking about

3    there's going to be a prosecution bar that will apply to any

4    information that comes from ARM.  ARM is exactly going to --

5    you know, have the exact same issues with Mr. VanHoutan as they

6    have -- will have with me or with any of the other defense

7    counsel.  So to the extent there's any kind of prosecution bar,

8    I mean, I'm not sure I've actually seen a one way prosecution

9    bar because most times defendants aren't -- are willing to, you

10   know, accept that a prosecution bar -- obviously when we're

11   talking about the inadvertent disclosure, any risk that is --

12   this is going to happen with me is exact same risk that's going

13   to happen with Mr. VanHoutan.  We're not talking about

14   companies.  We're talking about attorneys and we're talking

15   about experts.  And if Mr. VanHoutan does prosecution -- I

16   don't know if he does or if anybody at his firm or anybody

17   that's looked at this does prosecution, there's a much greater

18   risk that they're going to have an issue than me because I

19   don't do prosecution and no one at my firm does prosecution.

20   And so it's -- you know, the idea that somehow, you know, I

21   should be bound by a prosecution bar and Mr. VanHoutan should

22   not is completely unfair.

23        MR. VANHOUTAN:  Your Honor, may I respond to that?

24        THE COURT:  Of course.

25        MR. VANHOUTAN:  Defendants retained me.  I have a

1   fiduciary obligation to them as does everyone in my firm.  The

2   idea that defendants have to be protected from me seeing their

3   information is somewhat ludicrous.  They're giving it to me

4   voluntarily.  I have access to it at their volition.  What they

5   don't have control over is Mr. Harrington, his firm, his

6   experts.  That's why we need a protective order.  That's why we

7   need a prosecution bar, and it doesn't make any sense to have

8   it both ways because there's no information of theirs that

9   needs to be protected from me.  I'm not going to get any of

10  their information.

11       THE COURT:  Well, how are you prejudiced -- how are the

12  defendants prejudiced by a bilateral bar?

13       MR. VANHOUTAN:  I just don't think it's appropriate.

14  You're taking a situation where there's a one way flow of

15  information and then you're putting both parties in a situation

16  where -- you know, I certainly don't do any prosecution.  It's

17  above my pay grade, but I don't know if there's somebody else

18  that may have seen some information of Qualcomm unrelated to

19  this case that's going to be subject to a prosecution bar

20  because they do prosecution for another chip manufacturer.  I

21  just don't think it makes sense, given the realities of this

22  case.  If you have a case where you have two competitors and

23  they're both exchanging confidential information, a bilateral

24  prosecution bar makes perfect sense, but where you have an NPE

25  and then a bunch of, you know, producing defendants, a one way

1   bar is more appropriate.

2       MR. HARRINGTON:  Your Honor, many of the defendants are

3   competitors and they're being represented by the same counsel.

4   So the same counsel's going to get information from Qualcomm

5   as -- and Mediatek.  The idea that -- I mean, there's going to

6   be -- obviously there's going to be a risk that -- the same

7   risk that applies to Mr. VanHoutan applies to me.  There is --

8   and it's less to me because there's -- there are people at his

9   firm and the defense firm that actually do prosecution.

10      MR. VANHOUTAN:  I just don't understand that argument that

11  my clients need to be protected from me.  Now, if we want to

12  make a bilateral patent prosecution bar, I would say that it

13  needs to be triggered on technical information, meaning the

14  disclosure of confidential technical information triggers the

15  bilateral bar because they're not going to be producing any

16  confidential technical information to our side.  They don't

17  have any.  But we are going to be producing confidential

18  technical information to them.

19      MR. HARRINGTON:  Your Honor --

20      MR. VANHOUTAN:  So if there is a bilateral bar -- excuse

21  me -- then I think it should be triggered off confidential

22  technical information and not just confidential information

23  which could be license agreements.

24      MR. HARRINGTON:  We agree that the license agreements

25  shouldn't be subject to a prosecution bar for either party

1  obviously.

2      Mr. VanHoutan just said that we're not going to be

3  producing any documents.  He doesn't know that's true.  These

4  documents came out -- this company was a technical company.

5  They had documents.  Some of those documents --

6      THE COURT:  No.  He's saying -- and so he's saying if

7  there are technical documents and it's bilateral, he just wants

8  it to only be technical documents.

9      MR. HARRINGTON:  Yeah.

10      THE COURT:  Then I'm -- then that's what I'm going to do.

11  It'll be bilateral, but it will be -- the bar will be only with

12  technical information --

13      MR. VANHOUTAN:  Okay.

14      THE COURT:  -- that's produced.

15      MR. HARRINGTON:  Your Honor, I -- the other additional

16  thing that I think is important to have for the prosecution bar

17  is the prosecution bar should only be limited to doing

18  prosecution for the particular client.  So they should only

19  be -- you know, Mr. VanHoutan should be prevented from doing

20  prosecution on behalf of Qualcomm or Mediatek or whoever he's

21  representing and we should be prevented from bringing

22  prosecution on behalf of American Patents.  That is what

23  Deutsche Banks set forth.  It was -- the risk was that the

24  attorney was essentially acting as, you know, almost in-house

25  because the relationship was so close and so Deutsche Banks

1   didn't go as far as what they're asking for, which is the

2   general prosecution bar that applies to any prosecution outside

3   of the current client you're representing.

4       MR. VANHOUTAN:  So I think that's correct that Deutsche

5   Banks does pertain to a situation where you had almost an

6   in-house outside counsel is doing prosecution.  That's not the

7   situation here.  I don't think counsel's going to be the

8   lifelong -- have a lifelong relationship with American Patents,

9   and so what we're trying to protect here is the inadvertent

10  disclosure of defendants -- or of both parties' confidential

11  technical information.  And if this case concludes tomorrow,

12  they shouldn't be able to inadvertently use that information.

13  Both counsel and experts for another client or a competitor of

14  defendants.  What we're trying to protect here is the

15  information.  It doesn't matter who it's for.  It could be for

16  anybody, but limiting it to American Patents when it's a non

17  practicing entity, you know, I doubt that Mr. Harrington is

18  going to be representing them ten years from now.  It's sort of

19  ludicrous.  We're trying to protect the --

20      THE COURT:  Isn't this a prosecution bar though?

21      MR. HARRINGTON:  Yes, Your Honor.

22      THE COURT:  I mean -- I mean, y'all aren't -- y'all don't

23  do any prosecution.  I mean --

24      MR. HARRINGTON:  No, Your Honor.  That's why it shouldn't

25  apply to us.  I mean, that's what Deutsche Banks says is that

1    you should look at each attorney and each situation.

2        MR. VANHOUTAN:  Your Honor, it applies to everyone who

3    receives the information, and most importantly that's their

4    technical experts and consultants.  So I don't know who those

5    people are.  I don't know what they do.  I don't know who they

6    work for.  I don't know if they're inventors and prosecuting

7    patents themselves.  So I don't know what Mr. Harrington's

8    going to do a year from now.  It's to protect the inadvertent

9    disclosure and use of our information in ways that we can't

10   envision right now.  And it's limited in time and it's limited

11   to only those that receive the information.  So it's got --

12       THE COURT:  So let's skip forward and maybe that will take

13   care of it because I may go broader than Mr. Harrington wants,

14   but let me hear from you all why it should be one year or two

15   years.

16       MR. HARRINGTON:  So I think that the standard protective

17   orders I've seen they're usually one year.  And so it should

18   be -- I mean, it should be limited in -- this entire -- this

19   entire prosecution bar needs to be narrowly construed.  I mean,

20   that's what Deutsche Banks says.  You need to be really

21   careful.  You're preventing clients and you're preventing

22   experts from working in certain instances.  This is -- my

23   expert may be in the industry of -- you know, he may have a

24   bunch of patents of his own and you got to be very careful when

25   you're putting these prosecution bars.  So it should be

1    limited.  I think a year is the standard.  That's what's in

2    the --

3         THE COURT:  I am pretty sympathetic to you why you all

4    want two years.  I mean, a year --

5         MR. VANHOUTAN:  We think two years is more the norm.

6    There's two protective orders just entered in this court in the

7    last couple of months on similar cases where two years was

8    entered.  We think two years is a sufficient amount of time for

9    the technical information that's in an expert's or plaintiff's

10   head -- or excuse me -- counsel's head to sort of fade away.

11   But if I could -- go ahead.  Sorry.

12        THE COURT:  So I'm going to do -- I'm going to make it as

13   broad in terms of what it covers as the defendants are

14   suggesting, but I'm going to limit it to one year.  Are you,

15   Mr. VanHoutan, able to conform --

16        MR. VANHOUTAN:  Sure.

17        THE COURT:  -- the protective order to that?

18        And then let's talk about whether the scope should include

19   IPRs or post grant relief.

20        MR. VANHOUTAN:  Your Honor, I'm happy to address that.

21        So plaintiff in its brief was talking about defending

22   against an IPR.  There's nothing in defendants' proposed

23   protective order that prevents them from defending it against

24   an IPR.  An IPR is based on prior art.  It's arguments on claim

25   construction.  They can do that fully.  What it -- what they

1    can't do is prosecution, and that's the amendment of claims in

2    an IPR.  It is rare, but it is done, and what we're talking

3    about is again protecting the inadvertent use or disclosure of

4    defendants' confidential information used by plaintiff's

5    counsel, used by plaintiff's experts in trying to amend claims

6    in an IPR.  So they can fully participate in an IPR.  They just

7    can't amend the claims in an IPR.  And I would say if you look

8    at the Deutsche Banks case, one of the considerations when you

9    balance the risk of inadvertent disclosure with limiting a

10   potential party from a counsel of his choice is, what's the

11   relationship with that counsel?  Are they their effective

12   in-house outside counsel and do prosection over and over?  And

13   they don't.

14        THE COURT:  Let me go to Mr. Harrington because I start

15   off being sympathetic to your position anyway.

16        MR. HARRINGTON:  So, Your Honor, in an IPR we've --

17        THE COURT:  And what I mean by sympathetic is limiting it

18   to the -- I see the problem being if there are going to be

19   amendments of the patent, that's where my concern is.

20        MR. HARRINGTON:  So, Your Honor, in an IPR you're only

21   allowed to narrow claims.  So the only way you can actually get

22   new claims is to narrow those claims.

23        THE COURT:  And Josh told me that yesterday.  I should

24   have remembered that.  I didn't handle IPRs.

25        MR. HARRINGTON:  I don't see how the risk is that we're

1  going to somehow use their information to cover their claims,

2  their claims that are already by definition, if we have claims,

3  they would already be covered by our claims and then we'd

4  narrow them and they'd still be covered.

5      THE COURT:  And you would only be narrowing them -- you

6  would be narrowing them, I take it, in an effort to avoid their

7  art saying --

8      MR. HARRINGTON:  Your Honor.

9      THE COURT:  -- that there's invalidity, and any art that

10  you're talking about would be public.  So you --

11      MR. HARRINGTON:  Yes.

12      THE COURT:  You would not be limiting -- you would not be

13  narrowing y'all's claims at the IPR stage based on any

14  technical information you got from the other side?

15      MR. HARRINGTON:  Yes, Your Honor.

16      THE COURT:  Did I have all that right?

17      MR. HARRINGTON:  That is completely correct.

18      MR. VANHOUTAN:  So a couple of comments, Your Honor.  I

19  mean, every protective order has sort of a base level

20  protection for the use of the confidential information, meaning

21  the overt use is prohibited.  You can only use the information

22  you receive under a protective order for the purposes of

23  litigation.  Full stop, right?  The prosecution bar is the

24  other -- is the flip side of that.  It's the inadvertent use.

25  It's the information that's in your head that you can't get rid

1   of as a human being.

2        THE COURT:  Okay.  But how are they -- again, how do you

3   inadvertently use information that you all have to limit

4   claims?

5        MR. VANHOUTAN:  So they get our confidential information,

6   correct?  They're working on the case.  They're trying to get

7   their infringement analysis.  They're doing an expert report.

8   They close that file on their desk.  They turn to an IPR.  Now

9   they've got to amend claims to get around the prior art.  They

10  can't divorce our confidential technical information from their

11  head.  So they get to use that information which they would not

12  otherwise have but for this litigation to continue to try to

13  capture, in their opinion, capture our products.

14       THE COURT:  Yeah, but they can't do that.

15       MR. VANHOUTAN:  They can't.

16       MR. HARRINGTON:  They've already been captured.

17       THE COURT:  Let me --

18       MR. HARRINGTON:  Sorry.

19       THE COURT:  I'm saying that they're either -- they're

20  making the net smaller.

21       MR. VANHOUTAN:  Right.

22       THE COURT:  I mean, I would get it if they could make the

23  net bigger.  That would be a great thing and, you know, and all

24  that, but they're -- they are -- they can only make the net

25  smaller and they're only making the net smaller because you've

1   given them the Smith art that says this and they'll say, okay.

2   Well, we'll do this.  That -- I mean, I get that they -- I

3   mean, they -- they've already -- they're here because they have

4   looked at your products and done a good faith analysis that

5   under the current claims it covers your patents.

6        MR. VANHOUTAN:  Right.

7        THE COURT:  And so all they can do is have less coverage

8   by amending their claims.

9        MR. VANHOUTAN:  But they can still try to get coverage

10  based on defendants' confidential technical information which

11  they would not otherwise have.

12       THE COURT:  Okay.  You're not going to persuade me of

13  that.  So I'm going to -- I'm not sure exactly how to

14  articulate now what that means, but I am -- in terms of --

15  Mr. Harrington, help me out exactly --

16       MR. HARRINGTON:  So on Page 9 I would say for purposes of

17  this section, prosecution activity shall mean -- and then I

18  would just at the very end of that sentence I would say, you

19  know, not withstanding the foregoing, this shall not include

20  practice in front of an IPR board or PTAB board.

21       MR. VANHOUTAN:  Your Honor, I think if you just strike

22  patent, that would fix it.

23       THE COURT:  Well, I tell you what.  Here's what I'm going

24  to do because I'm not sure I can get it exactly right.  I think

25  you all understand what I want and so y'all figure out for

1    yourselves what the protective order language should say, but I

2    am -- to make it clear, it's not going to cover IPRs.

3         MR. HARRINGTON:  And the same arguments would be for

4    re-exams as well, Your Honor?

5         THE COURT:  And re-exams.  Yes.  I agree.

6         Okay.  Then we have the patent acquisition bar.  And where

7    is that at in the --

8         MR. VANHOUTAN:  It's the next page, Your Honor, Page 10,

9    Subheading B.

10        THE COURT:  Okay.  And, Mr. Harrington, what's your

11   position on this?

12        MR. HARRINGTON:  I have -- for the prosecution bar, at

13   least I understand where that comes from.  The Deutsche Banks

14   case allowed that.  Patent acquisition bar they have no Federal

15   Circuit precedent whatsoever that supports having a patent

16   acquisition bar or the next thing which is a development bar.

17   Both of these are simply meant to prevent experts and attorneys

18   from working -- you know, from working in the field or working

19   for the clients.  There's really -- the patent acquisition bar,

20   I don't see any distinction between a patent acquisition bar

21   and a litigation bar.  I mean, I'm surprised they didn't just

22   ask for that plaintiff's counsel shouldn't be allowed to sue

23   anybody else based, you know, later on.

24        THE COURT:  I'm sure they thought of that.

25        (Laughter.)

1          MR. HARRINGTON:  But there is no logical distinction

2    between a patent acquisition bar and a litigation -- well, the

3    reason they thought of that and they didn't do it is because

4    they knew it would be ludicrous and it would be -- it's clearly

5    illegal.  They can't prevent attorneys and experts from working

6    in their chosen fields in that way.  Patent resolution bar,

7    development bars have been addressed by many courts and the

8    vast majority of the time they're struck.  They pointed to a

9    couple cases in which courts have allowed an acquisition bar.

10   I don't think they've actually pointed to a single case in

11   which a development bar was allowed, but in any event, these

12   are things -- they have to show some sort of good cause for

13   these bars and they haven't, right?  Even if you're assuming

14   the same logic as Deutsche Banks, you still have to show some

15   kind of good cause and they haven't.  And not surprising again,

16   they only want these to apply to plaintiff and not to defense

17   counsel.

18          THE COURT:  Well, I -- we've been through these.  I'm not

19   going to include a patent acquisition bar or a development bar.

20   That's not going to be necessary.  Maybe I'll be persuaded over

21   the course of my career on the bench that those are needed, but

22   so you guys know, I think Mr. -- one of you said that there are

23   other protective orders I've signed that had something else in

24   them.  Those have been without my assistance.  You guys are the

25   first guinea pigs who have actually come in here, and I'm

1   actually trying to do what I -- the Court is going to come --

2   the Court -- this is important to me and I really wanted to

3   take as much time as I could and hear from really good lawyers

4   because we're going to come out with a model protective order

5   for my court.  I don't think the one that's the standard order

6   for the Western District is anywhere near adequate for the

7   patent cases I have.  And so there's a good chance -- so don't

8   screw this up.

9       (Laughter.)

10      MR. VANHOUTAN:  No pressure.

11      THE COURT:  There's no pressure.

12      I think probably what we wind up with in this case will be

13  pretty close to what I do -- what I have as the standing

14  protective order for my court.

15      So what else do we have to take up, Mr. Harrington?

16      MR. HARRINGTON:  I think there was another issue with the

17  depositions, how to use these during the depositions.

18      THE COURT:  How to use?

19      MR. HARRINGTON:  The confidential information.

20      THE COURT:  Okay.  Tell me --

21      MR. HARRINGTON:  But I think the -- based on what you said

22  for the source code, I think it may not be a dispute anymore.

23      THE COURT:  Okay.

24      MR. VANHOUTAN:  Your Honor, I just want to touch on that a

25  bit because maybe the parties were talking past each other on

1   this dispute.

2        THE COURT:  Okay.

3        MR. VANHOUTAN:  I don't know that there is a dispute.

4        THE COURT:  Well, back up just to put on the record.  I

5   don't even know what y'all are talking about right now.  So

6   start me off with what you think there may or may not be a

7   dispute on.

8        MR. VANHOUTAN:  If Mr. Harrington doesn't believe there's

9   a dispute, then neither do we.

10       THE COURT:  Okay.  Whatever it is that -- which I don't

11  know.

12       MR. HARRINGTON:  Can you give me just one minute, please,

13  Your Honor?

14       THE COURT:  Yeah.  Take -- let me just say I have

15  absolutely no idea what it is you're talking about right now

16  which is usually -- is kind of my standard situation.

17       (Conference between counsel.)

18       THE COURT:  Do we have an issue?

19       MR. HARRINGTON:  I don't think so, Your Honor.

20       THE COURT:  Okay.  So there are a couple of things my

21  brilliant clerk pointed out to me that we didn't go over that

22  you guys may have been fussing over.  And, again, because I

23  care about this stuff, I'm going to ask for y'all's input.

24  Apparently at some point we felt like the plaintiff was

25  concerned that the prosecution bar and defendants' proposed

1    protective order was broader than the Eastern District of Texas

2    because it expanded the technical scope from, quote, "field of

3    inventions for patents-in-suit" to, quote, "involving claims

4    related or relating to the information disclosed."

5        Mr. Harrington, is there anything you wanted to say about

6    that?

7        MR. HARRINGTON:  Yes.  I mean, again, this is something

8    that doesn't affect my firm that much and -- but it may affect

9    our experts, and involving claims related to, you know, the

10   information disclosed, they can disclose kind of almost

11   anything, right?  I mean, they can make a huge production that

12   they made in another case and some of it may be irrelevant and

13   that's -- they can do that just because that's what they're

14   allowed to do.  We shouldn't be limited to -- because they've

15   chosen to disclose things that are outside of the invention, we

16   shouldn't be somehow harmed by that.  So what should be -- I

17   think that normally the protective orders are related to the

18   information that's related to the technology in the

19   patent-in-suit.  To the extent they -- you know, I mean, that

20   really -- if they're producing documents beyond that, that's

21   really their own fault and we shouldn't be -- our experts

22   should not be harmed by that.

23       THE COURT:  Okay.

24       MR. VANHOUTAN:  I can promise Your Honor that we're not

25   going to be producing documents beyond those that we absolutely

1   have to produce in this litigation.

2          THE COURT:  I understand.

3          MR. VANHOUTAN:  But that's really what we have to protect.

4   We have to protect against the inadvertent disclosure or use of

5   the confidential technical information that defendants are

6   going to be providing to plaintiff and its experts.

7          THE COURT:  Well, let me ask you this.  Here I think may

8   be my better question is I have great respect for the lawyers

9   from the Eastern District and the judges in the Eastern

10  District, and if those brilliant folks have been satisfied with

11  fields -- with field of inventions for patents-in-suit, why do

12  I need to fix it?

13         MR. VANHOUTAN:  With all due respect to my colleagues in

14  the Eastern District, and I have a trial there next month, I

15  think it's a little vague personally and I think the -- if we

16  set the information as the information that we're actually

17  going to be providing, that's the information that we're trying

18  to protect, that's the information that we're trying to

19  guarantee is not inadvertently used, that it's just a lot more

20  clear as to what the scope of the prosecution bar is.  And,

21  again, it's limited.  It's only a year under Your Honor.  So

22  it's not like we're putting these people out of business.  They

23  can't take the confidential information they receive from

24  defendants in this litigation and use it not only for American

25  Patents which is just, you know, an NPE but for anybody else

1  they might work for within that year period or they might be

2  currently working for.  We don't know who those people are.  We

3  don't know who the experts and consultants are.  So that was

4  the purpose of that inclusion.

5      MR. HARRINGTON:  Your Honor, they will know who that --

6      THE COURT:  I'm good with the -- I'm got good with field

7  of inventions for patents-in-suit.  I think it worked -- it

8  works for the Eastern District and they I think are pretty up

9  to speed on this stuff.

10      With regard to expert disclosure, is there anything in

11  this protective order about the procedure for expert

12  disclosure?

13      MR. VANHOUTAN:  There is, Your Honor.

14      THE COURT:  And where is that at?  If you can help me find

15  that.

16      MR. VANHOUTAN:  There you go, Your Honor.  Page 24,

17  Paragraph 13.

18      THE COURT:  Okay.  I thought that was right.  That's where

19  I was at.

20      Mr. Harrington, do you have any objections to what's in

21  Paragraph 13?

22      And I'm asking you this both on the case -- this

23  particular case, but I'm also -- again, I'm very interested --

24  you know, I think, you know, again as we're trying to come up

25  with a model of a way of doing things, I figure if someone's

1    going to think from your side it's not the right way to do it,

2    I'd hear from you now and I could get the other point of view.

3        MR. HARRINGTON:  So, I mean, I went through this language.

4    It's not -- it's not the language I would choose.  I think that

5    what you should say is that, you know, you could give the --

6    you should give the job history, should give your CV, and then

7    they can make their objections.  What they have is they have,

8    further -- at the very bottom Page 25:  Further, the party

9    seeking to disclose protected information shall provide other

10   information regarding the expert or consultant's professional

11   activities reasonably requested to evaluate whether good cause

12   exists.

13       I think that -- you know, I think what we should have is a

14   standard set of information and it shouldn't be a continual

15   back and forth.  So if they want some particular information,

16   they should put it in the -- put it in here now.  I don't know

17   what you would ask for aside from, you know, the -- your prior

18   litigations and your CV.  But if they want additional

19   information, it shouldn't just be an open ended thing.  They

20   should say what it is now.

21       MR. VANHOUTAN:  Your Honor, this is a bilateral provision.

22   So it's a situation where we lay out -- and it applies to both

23   parties -- what exactly you need to disclose to the extent it

24   exists, and if there's something else that you need, you get to

25   ask for it.  And the other side, you know, cannot reasonably

1 refuse to provide it just because it's not specifically laid

2 out.  I don't think that's controversial why all litigants

3 wouldn't want that.

4     THE COURT:  Yeah.  I'm okay with that.  And then --

5     MR. HARRINGTON:  The other issue I have with this

6 provision is the number of days.  So on Page 26:  The producing

7 party shall be entitled to object to disclosure within 14 days

8 after receipt of the information.  And then you have 14 days --

9 you have to basically apply to the Court within another 14

10 days.  That's 28 days.  As Your Honor was just describing, a

11 lot of times these issues come down, you know, to there's a lot

12 of timing issues before expert reports, and having a full month

13 before we can disclose information to a -- potentially to our

14 expert is too much time.  I think that the time in this should

15 be, you know, more like three to five days for the -- three to

16 five -- we should be able to resolve this in a week.

17     MR. VANHOUTAN:  Your Honor, I would say that 14 days and

18 14 days is more than appropriate given a patent case and the

19 normal length of a patent case.  This case was filed November

20 of last year.  I mean, plaintiff still hasn't identified its

21 experts.  You should identify your experts early, give the

22 other side.  And in this instance I have several defendants I

23 have to check with to see if these people are okay, if there's

24 any objections.  You know, I think that's done early.  If

25 you're doing that right before your expert reports, you've got

1    real problems.  I mean, this is something that's usually

2    handled at the outset of litigation, and I think 14 days for

3    both is reasonable.

4         THE COURT:  I think with regard to the first 14 days, I

5    think that's entirely reasonable, but I think -- I do worry

6    about it getting delayed after that and not getting resolved.

7    So I'm going to shorten in -- on Page 26 under (b)(i) to seven

8    calendar days.  And frankly this will be in the -- I mean, this

9    is the order, but as far as I'm concerned, I will tell you both

10   again if -- reading y'all's language, if you're unable to agree

11   on the disclosure to the expert or consultant, as far as I'm

12   concerned, you can contact me immediately.  I mean, again the

13   kind of stuff that makes my head explode is when I was a lawyer

14   was having to wait to get things resolved where the delay

15   didn't benefit anybody.  So, you know, I'm always available.

16   You guys are good.  The great thing when I go places and talk

17   about why I want patent cases, the great thing is you don't get

18   many not great lawyers in patent cases.  It's -- I think the

19   best lawyers that I've ever practiced with do this work.  And

20   so if you guys can't get something resolved, typically there's

21   a good reason why American Patents is taking one position and

22   Mediatek is taking a different position and you guys need to

23   have me help resolve it.  I mean, everything that you've

24   brought in front of me today I think is well thought out and

25   someone just has to make a decision on it and so I invite you

1    guys to come to court sooner rather than later and get stuff

2    worked out.

3        And so finally -- oh, I just took care of it.  So I'm -- I

4    foresaw something my brilliant clerk told me to make sure that

5    I did.  So is there anything else we need to take up with

6    respect to the protective order on?

7        MR. HARRINGTON:  So, Your Honor, there's two additional I

8    think disputes, and I'm actually -- I was just trying to find

9    the provision.  One of their provisions requires us to not

10   produce documents to the other side to -- between the

11   defendants.  I think they got that from a --

12       THE COURT:  You're -- I'm not tracking.

13       MR. HARRINGTON:  So let me just find it real quick.

14       MR. VANHOUTAN:  I'm able to help, Your Honor.

15       THE COURT:  Okay.

16       MR. VANHOUTAN:  What we're prohibiting is a production

17   from one defendant being provided by plaintiff to another

18   defendant's counsel.  Now, if you have a situation where I

19   represent a number of defendants, that doesn't exist.  But I

20   don't represent Lenovo, for example.  So we are prohibiting

21   plaintiff --

22       THE COURT:  So let me just make sure I'm tracking.

23   You'll -- just again I'll pick Mediatek just as an example.

24   Mediatek gives information to American Patents and production.

25       MR. VANHOUTAN:  Correct.

1      THE COURT:  I don't have a problem with the plaintiff

2  providing it to the other defendants as long as it's not

3  confidential or highly confidential information.  I don't know

4  why -- I don't know any situation -- I don't remember any

5  situation where a plaintiff gave anything to the defendants,

6  but I would -- I would think if Mediatek gave something to the

7  plaintiff and it was neither confidential nor highly

8  confidential, then I don't know why the plaintiff couldn't give

9  it to another defendant.

10      MR. HARRINGTON:  Your Honor, I think it's probably helpful

11  to look at the actual language.  It's on Page 15, Section

12  11(g).

13      MR. VANHOUTAN:  And I agree with you there.  If it's a

14  public document, Your Honor, if it's not confidential, then

15  certainly we --

16      THE COURT:  So I am in agreement with the defendants that

17  the plaintiff should not be disclosing to a different defendant

18  than the defendant that produced it anything that is

19  confidential or highly confidential.

20      MR. HARRINGTON:  So the issue is is that this is a case

21  that is joined for trial.  We're -- we -- and they have not

22  moved to sever these cases.  So anything we use is going to be

23  used against -- from one party is going to be used against all

24  the parties and we go to trial and we say Mediatek does it this

25  way and they -- all of these parties do it this way and we have

1    evidence they do -- all do it that way, that's -- that's going

2    to be how we try our case.  It's -- we can -- and as Mr.

3    VanHoutan said, he's representing most of these -- several of

4    these defendants.

5        THE COURT:  But I'm still not following.  Why do you need

6    to give -- I'll use Lenovo here because he's not representing

7    Lenovo.  Why do you need to give to Lenovo anything -- now,

8    here's what I do understand.  If you have a report -- if you

9    have an expert report, a damages report, for example, that

10   includes Lenovo information, then I guess we ought to figure

11   this out now how -- what we're going to do.  If we're going to

12   go to trial ultimately because I don't see any way of Mediatek

13   not getting that information.

14       MR. HARRINGTON:  That's exactly the issue, Your Honor.

15       MR. VANHOUTAN:  So I think we have to look -- let's I

16   guess talk about hypotheticals.  We've got a damages related

17   document from Mediatek that's produced by Mediatek to American

18   Patents in this case.

19       THE COURT:  Okay.

20       MR. VANHOUTAN:  That document should not be able to be

21   used by plaintiff's counsel.  It should, number one, not be

22   provided to Qualcomm's counsel who's sitting here in the room

23   who only represents Qualcomm.

24       THE COURT:  Right.

25       MR. VANHOUTAN:  And it should not be able to be provided

1    to Lenovo's counsel, for example.  And they should -- plaintiff

2    should not be able to use Mediatek's confidential information

3    in an expert report against Lenovo.  Mediatek's -- if that was

4    the case, I could never show anything that these guys produce

5    to any client because it would have other people's confidential

6    information in it.  If there's a damage report from Mediatek,

7    it should include Mediatek confidential information such as I

8    can share it with my client when it comes in.

9         THE COURT:  Right.

10        MR. VANHOUTAN:  I think trial's another animal.  We're

11   going to have to figure out and probably get some agreements

12   amongst defendants about who can be in the room when.  That's

13   going to be a complication, but this is about -- this is about

14   the discovery of the case.  This is not about trial.

15        THE COURT:  I think --

16        MR. HARRINGTON:  Your Honor --

17        THE COURT:  Go ahead.  I think Mr. Harrington's right.  I

18   mean, I think -- here's the deal.  Let's do it like this.  I'm

19   going to impose the restriction defendants want.  If there's

20   some reason that you -- the plaintiff decides they need in

21   order to protect what you're doing, that you need to

22   disclose -- I'll again make it up -- Qualcomm information to

23   outside of the Qualcomm lawyer for some reason, then you need

24   to let me know -- you need to let them know why it is -- you

25   need to let whoever's information it is know that you need to

1  do that.

2       MR. HARRINGTON:  So, Your Honor, I think that's -- it's

3  going to be really problematic in this case.

4       THE COURT:  I think it is.

5       MR. HARRINGTON:  Because we are planning on doing one

6  damages report because this -- these are all products that are

7  interrelated and it's our theory -- we want to use information

8  from Mediatek and from Qualcomm for all these defendants in

9  that one damage report.  We're also very likely going to do one

10  expert -- infringement expert report because it's based on the

11  same chip.  It's based on the same underlying fundamentals, and

12  so -- I mean, that's our -- we joined these cases because there

13  are -- all the -- the facts are very, very interrelated and

14  their chips all come from the -- kind of core infringing

15  technology all comes from one party.  Right?  We're accusing

16  all of the chips based on the ARM architecture and all of these

17  defendants are using that architecture and so it would be -- I

18  don't even -- like -- and so what we're talking about is, look.

19  We're not -- we will not produce documents to the other side

20  they give us.  We're not going to give one production to their

21  guys.  First off, Mr. VanHoutan will have them all because he's

22  representing all the parties except for -- so I don't even

23  know -- I guess I need to like send him an e-mail saying,

24  please only pay attention to this e-mail, you know, this

25  production or this filing with respect to Qualcomm, not with

1   respect to the other defendants.  I'm not even really sure how

2   logistically I would do that in this case.

3       Second off, it's -- I don't -- when we're filing something

4   with the Court, I mean, all we're talking about is what we're

5   going to then -- who we're going to then e-mail with the actual

6   filing.  It seems very strange to me that we would file

7   something to the Court saying, you know, we would like to have

8   a production from -- you know, these three defendants have not

9   given us our production and, you know, and -- but these other

10  two defendants have but only send it to one of the defendants.

11  Right?  We may be making arguments that go across -- you know,

12  the defendants are doing different things in different ways.

13  It's -- we're not talking about the Qualcomm getting these

14  documents.  We're talking about Qualcomm's counsel.  I'm very

15  sure that Qualcomm's counsel is trustworthy enough to, you

16  know, get Mediatek's information.  That's why -- I mean, we'll

17  make the -- we're talking about documents.  They're very likely

18  to be attorneys' eyes only.  They're not going to go to

19  in-house counsel.  And to have a situation in which we have

20  expert reports and we have filings with the Court that are only

21  going -- and we're going to be making arguments that go across

22  these defendants.  We're going to point to Qualcomm and say,

23  hey.  Qualcomm's doing something different than Mediatek's

24  doing.  That is very likely something that's going to happen.

25  For us to only to be able to then say, well, but this involves,

1    you know, one of your guys' information in this filing or it

2    involves both your information but now we have to redact some

3    of that information and send that information to Qualcomm and

4    send it to Mediatek, I think that really -- it doesn't -- isn't

5    fair to the attorneys involved and it's not fair to the

6    plaintiff.  It's -- and it's -- I don't think it's really a

7    workable situation.  I think that you're going to have a

8    situation where the attorneys are not going to have the full

9    information to argue the issues for themselves.

10         MR. VANHOUTAN:  Your Honor, may I respond?

11         THE COURT:  Uh-huh.

12         MR. VANHOUTAN:  Plaintiff chose to bring this case with a

13   number of defendants in one case.  So they're sort of -- you

14   know, they made their bed.  Now they've got to lie in it.  I

15   would be very I guess disturbed to hear that there's going to

16   be one damages expert report with all of the confidential

17   information of all defendants because I can't share that with

18   any client.  I mean, I can maybe share, you know, one little

19   portion that's Mediatek's with Mediatek.  They shouldn't be

20   able to use Qualcomm's sales information to show their case

21   against Mediatek.  That shouldn't be the case.  If they have an

22   infringement report that's based on just a third party's

23   technology, number one, they should have sued that third party,

24   but if we're all here and it's all based on one third party's

25   material, then yes.  That can be shared with everyone.  I think

1   if they file a document and it's got confidential technical

2   information, they got to file it under seal, they've got to

3   know whose confidential information it is and they provide that

4   via e-mail to the appropriate counsel.  I'm sorry that that's

5   an extra step, but they chose this case the way they chose it.

6   And so that's what we have to do to protect this confidential

7   information.

8         MR. HARRINGTON:  Your Honor, Mr. VanHoutan seems to be

9   saying that somehow it's -- you know, that we should treat this

10  case differently because there's multiple defendants.  It is

11  one case.  This case is we -- until they move to sever the

12  case, which they haven't done and they haven't indicated

13  they're going to do, this case is going to be tried as one

14  case, and so why should the discovery be done in any different

15  way?

16        THE COURT:  Well, we're not talking about discovery I

17  don't think.

18        MR. HARRINGTON:  Well, the discovery that we use at

19  trial -- or the information we use at trial --

20        THE COURT:  No.  No.  I get that.

21        MR. HARRINGTON:  -- will be the discovery we got.

22        THE COURT:  Well, I get that, but the -- we're -- but

23  that's a different -- that is a different animal.  And I don't

24  know.  I'll tell you what.  I'm going to have to think about

25  this one because I think we've been in a world for long enough

1    now where ordinarily every defendant is a separate case and we

2    may be dealing with it in one at the same time to -- up to

3    trial.  I don't remember the good old days which is when I

4    started when there were more than one defendant how we dealt

5    with it.  So I will tell you my spidey sense is that I'm -- I'm

6    not -- I don't know that there will just be one damages report,

7    and I doubt there'll be just one infringement report.  But I

8    don't -- I'll have to think about that.

9        And what else did we need to take up?  Because I don't

10   think that y'all need to know by tomorrow the answer to that.

11   So -- but you'll have it pretty soon.

12       MR. HARRINGTON:  I guess the other question I had for Your

13   Honor is for -- there's a bunch of other protective provisions

14   in here that we haven't discussed and I don't think they've

15   shown good cause.  What are we -- what is our plan to --

16       THE COURT:  That doesn't help me much.  What specifically

17   do you not want?  I mean, you may be right, but I don't know

18   what specifically you're talking about.

19       MR. HARRINGTON:  I think that's -- those are the major

20   objections we have.  I just -- I mean, I guess still it's my

21   kind of understanding and the law is that they have to show

22   good cause, and to the extent that there's a provision that

23   they're -- you know, they're asking for that's beyond the

24   Court's model order, it seems like that that provision

25   shouldn't -- if they haven't argued for it, that provision

1   shouldn't be included.

2       THE COURT:  Okay.  Okay.  Is there anything else on the

3   protective order?

4       MR. HARRINGTON:  So, Your Honor, I guess there's two

5   issues we have.  One, so the defendants have not produced any

6   confidential documents because they're waiting on the

7   protective order dispute and they're saying it may take some

8   time.

9       THE COURT:  No.  No.  No.  I don't want -- the only

10  portion that will take time is -- and it -- what I would

11  suggest you do is whatever it is that y'all are unhappy about

12  with regard to your ability to -- the plaintiff's ability to

13  share third party documents, I'm going to -- I'll leave that

14  in.  I'm going to sign it with the understanding that I'm not

15  sure that that's on that portion what I'm going to wind up

16  doing and I may enter an amended protective order with respect

17  to that specific issue, which I don't think will come up in the

18  next week because I want the protective order to get -- I'm

19  going to -- once I get back from -- with the changes that I've

20  gotten from this -- as a result of this hearing, I'm going to

21  sign the order.  And you guys are going to -- y'all will be off

22  to the races.  I may amend that portion of it that deals with

23  the ability that may or may not allow the plaintiff to share

24  documents.  I'll just have to think of what I'm going to do on

25  that.  And we may even have to have another hearing once I have

1    thought about it because that will be a very tough one in this

2    case.  I get why you want your experts to have a comparison

3    between the defendants in terms of there may be different

4    reasonable royalties that you think are appropriate for

5    different reasons.  I get that.  And I get why they don't want

6    you to be able do that, and so I'm going to have to give that a

7    little more thought.  I didn't -- I wasn't prepared for that

8    this morning and I think it's important enough that I'll deal

9    with that.

10           MR. HARRINGTON:  Okay.

11           THE COURT:  I understand.  You can tell your clients I

12    completely get what the problem is and, you know, I've dealt

13    with that.  I've dealt generically with damage issues before so

14    I'll work through that.

15           And so is there anything else you want to take up with

16    regard to the protective order?

17           Mr. Harrington?

18           MR. HARRINGTON:  Could you just give me a quick minute to

19    confer?

20           THE COURT:  And, Mr. VanHoutan, is there anything you

21    wanted?

22           MR. VANHOUTAN:  No, Your Honor.  Thank you.

23           (Conference between counsel.)

24           THE COURT:  Anything else?

25           MR. HARRINGTON:  Not unless you want to hear argument on

1   any of the issues that we've just discussed.  I think that's

2   all we have for the new issues.

3       THE COURT:  And another thing I would like for you all to

4   do is come to an agreement and let Josh know which section of

5   the protective order it is we were just discussing with respect

6   to --

7       MR. HARRINGTON:  Oh, we have it.

8       THE COURT:  If you can tell me that.  I want to make sure

9   we're looking at the right section.

10      MR. HARRINGTON:  It's -- the third party is Section 11(g)

11  on Page 15.

12      THE COURT:  Okay.  Okay.  So --

13      MR. HARRINGTON:  And if --

14      THE COURT:  So for the record I'm going to sign -- once I

15  get back a clean copy that includes the modifications I've

16  ordered today, I'm going to sign a clean copy, but I want

17  everyone to know that I'm going to be looking at Section G and

18  that we will very -- I'm going to do this very quickly, but I

19  don't want anyone to be surprised if -- either we have another

20  hearing or if we have -- if I modify Section G, but unless one

21  of you all tells me differently.  And the only part of that

22  is -- that I care -- that I'm going to be modifying, if I do,

23  is the ability of the plaintiff to disclose to defendants other

24  defendant's confidential or highly confidential information.

25  The rest of it I'm not going to be touching.

1      MR. HARRINGTON:  Your Honor, would it be helpful to have a

2   briefing on the issue?  I'd be happy to brief that up.

3      THE COURT:  I think if you have anything that is, you

4   know, short and to the point, yes.  I get the issue.  I just

5   haven't had a chance to think through it, but I'm not saying

6   don't send something in.  If there's a case you have or --

7      MR. HARRINGTON:  We've briefed this issue in front of

8   other courts and we've had this dispute.

9      THE COURT:  If you've briefed it, send something in.  I'll

10  give the other side an opportunity to respond and then I'll

11  take -- I'll either have a hearing or I'll decide.  I'm sure

12  that'd be helpful.

13     MR. HARRINGTON:  Okay.  We'll do that, Your Honor.  Thank

14  you.

15     THE COURT:  Because I want to get that right.

16     So and then you all mentioned when you came in that there

17  was a discovery issue to take up?  Is there a discovery issue?

18     MR. HARRINGTON:  Yes.  There is, Your Honor, and

19  Mr. Thompson will be arguing on behalf of American Patents.

20     THE COURT:  Okay.  Yes, sir.  How are you today?

21     MR. THOMPSON:  I'm doing fine, Your Honor.  Larry

22  Thompson.  I'll be talking about the discovery dispute and I'm

23  handing up -- these are just excerpts from the infringement

24  contentions that we did in this case against defendants.  I've

25  given -- here's one here.  And I think it's going to be

1    important because a lot of the dispute comes down to what

2    defendants are saying about the contentions we have made and

3    whether or not they're sufficient.

4         THE COURT:  Okay.

5         MR. THOMPSON:  So what we're asking here is for the Court

6    to compel defendants to comply with the schedule that they

7    agreed to and that the Court ordered.  As part of the Court's

8    schedule, plaintiff was to serve infringement contentions

9    identifying accused products and outlying its theories.  That's

10   what we did here.  You'll see in this document that the first

11   tab is sort of a cover document that goes over what the accused

12   claims -- I'm sorry.  The asserted claims are, which charts are

13   included, the general functionality which are certain devices

14   using this sort of ETM/PTM technology that counsel's mentioned

15   so far.  And then it says a list of identified accused products

16   each defendant has provided in the appendices.

17        THE COURT:  Slow down just a little bit.

18        MR. THOMPSON:  I'm sorry.

19        And then it also makes a reference to a list of accused

20   products that are provided in appendices.  And what we did

21   there was even going beyond the functionality that we identify,

22   we went out and used all the public information that we could

23   to find every product that had these functionalities and put

24   them into tables, and you'll see in the -- what you have here

25   the first four tabs after this initial document that are

1    Exhibits 17, 18, 19 and 20 are the charts, and then beyond that

2    we have the appendices for each defendant showing all the

3    products that were listed, information about, you know, where

4    those products are defined on their web site, information about

5    the various versions of the ETM/PTM functionality that's being

6    included and we just tried to give the defendants as much

7    detail as possible.

8         THE COURT:  Okay.

9         MR. THOMPSON:  And so as part of the Court's schedule, the

10   next step was for defendants to on August 30th serve summary

11   financial information for all accused products and to serve the

12   technical information showing the operation of all accused

13   products.  Defendants refused to do so.  And they -- you know,

14   the defendants have only produced information about 16 of the

15   600 accused products and they have some theory that those 16

16   are the only ones that we've done our job for and they don't

17   have to do anything for the other 600.  And what defendants

18   didn't do here was to seek relief from the Court, you know,

19   move to strike our contentions as to the other 500 plus

20   products, move for a protective order seeking some relief, you

21   know, move to delay the schedule.  They've done nothing to say,

22   we're just not going to comply with this order even though we

23   know which products you guys have named.  And I think that's

24   self help and this Court should not reward self help.  But even

25   if defendants had done the right thing and say they had

1    actually moved to strike our contentions, it wouldn't change

2    their discovery obligations here.  So what defendants have said

3    is that these -- the accused products are all different, but

4    the only differences they've identified so far relate to a

5    small subset of features that are part of the accused claims.

6    These differences they're alleging relate to less than half of

7    the asserted claims and they relate to less than 15 percent of

8    the accused products.  And so even if they were to win a motion

9    to strike and to get rid of some of the -- you know, the

10   theories we have against products I think are different, that

11   wouldn't change your obligations because all the remaining

12   claims are asserted against the remaining specific projects.

13   So they would still have to give the same technical information

14   and the same sales information even if they were right about

15   everything they're saying.  And we disagree that they are

16   right, but I think that's a very easy way to cut through what's

17   going on here.

18       Another objection defendants have made is they claim

19   there's a -- too much of a burden, you know, on them because we

20   have so many products and it'll just take too much time to

21   actually give us all the documents.  Well, we have been more

22   than willing to help the defendants reduce that burden.  We

23   suggested, you know, representative products, because if

24   it's -- if we've chosen representative products, you know, they

25   could potentially limit their production to things for that

1    product or the sort of overlying technology for products and

2    that would cut down on a number.  Defendants have refused to

3    engage in that.  I mean, we've asked them to make proposals

4    about -- if there's a certain bucket they want to use and put

5    certain products in different buckets, I mean, we'll defer to

6    them, but they refuse to do that.  They've maintained that all

7    the products are different, although they haven't told us all

8    the reasons why and they're refusing to give us the information

9    we would need to prove them wrong.  And our view is --

10       THE REPORTER:  Counsel, you need to slow down.

11       MR. THOMPSON:  I'm sorry.

12       I think that's just really unworkable, Your Honor.

13       MR. VANHOUTAN:  So, Your Honor, I think we touched on a

14   little bit of this when we were talking about the protective

15   order, but basically what's being accused here is the

16   functionalities provided by a third party.  And they provide a

17   number of designs that are incorporated into integrated

18   circuits and then there's a functionality that sits on that

19   microprocessor core that's specifically accused here.  So when

20   we got plaintiff's infringement contentions, which was about 16

21   products worth of charts, 16 charts, one chart per patent per

22   defendant, and I'm talking just about the non Lenovo defendants

23   that I represent, we reached out to plaintiff and said, hey.

24   This is not sufficient.  And they wrote back and said, yeah.

25   It is.  Send us the documents.  I picked up the phone and

1   called counsel and said, can we work this out?  And counsel did

2   say, well, you know, maybe we'll deal with a smaller set of

3   production if you tell us that these are representative, and I

4   said I can't do that.  They're not.  What you have charted is

5   not representative of everything.  There's different

6   architectures and different functions and designs in these

7   other cores that you didn't chart.  So here's the -- really the

8   rub.  They charted one microprocessor core from ARM and one

9   version of what's called ETM, embedded trace macrocell, and

10  that's it.  And they identified the products that have that

11  core and that ETM version in their chart.  They only gave us

12  one chart, but they identified those products, and that's fine.

13  We don't have an issue with that.  But there's 24 other ARM

14  architectures that are implicated in the 600 other products

15  they just identified by name and six versions of ETM.  They

16  don't function the same and they aren't materially the same for

17  infringement purposes.  Now, they say they are.  Okay.  Well,

18  we disagree.  We gave them example as a way to try to bridge

19  the gap of here's one way you're wrong.  Here's the public

20  documents that show that and they just said, no.  We disagree.

21  Give us the documents.  If they contend that they're materially

22  the same, prove it.  Give me an infringement chart for that

23  microprocessor or architecture and you can just list the

24  products there and show me how it's the same.  They're hiding

25  the ball.  They only want to read their claims on one

84

1    architecture, not something that's different.  If they did

2    that, that would show defendants, okay.  Here are the disputes

3    for claim construction.  They're having to read the same claims

4    on different architectures.  I'll say products.  So now we see

5    where the problems are going to be.  Now we see what the

6    disputes are going to be.  That's what they haven't done and

7    that's what we've been telling them all along.  Give us the

8    charts for the -- if you want to say it's the architectures,

9    fine.  You can identify the products that have those

10   architectures, but you haven't met your burden yet.  So we're

11   not obligated to produce these documents until you do.  That's

12   defendants' position.

13       MR. THOMPSON:  Your Honor, I disagree fundamentally with

14   the approach defendants are taking here.  Mr. VanHoutan said

15   that our goal was to -- our obligation was to prove it, to

16   prove that all these products act the same.  That is not the

17   goal of infringement contentions.  Infringement contentions are

18   about laying out what your theories of infringement are and

19   providing evidence that illustrates those theories and we have

20   done that.  We have laid out our theories of infringement as to

21   every one of those 600 accused products.  The idea -- and the

22   evidence we use in the charts, admittedly, was -- used

23   exemplary evidence from one of the biggest most commonly used

24   versions of ETM which is ETM 4.0 and one of the most commonly

25   used ARM cores which is the A53.  98 of the accused products

1    have the A53 core.  There is no reason why any of those should

2    be excluded because they work exactly the same as the 16 that

3    Mr. VanHoutan is talking about.  The differences that they've

4    identified are only for chips that have ETM versions below 3.5.

5         Now, without getting into the nitty-gritty, ETM 3.5 and

6    above and the PTM versions which have the same functionality is

7    over 500 of the accused products.  So again, I mean, the issues

8    they're talking about only relate to a very small subset of

9    products and we've given them our theories of infringement as

10   to all of them.  If we're wrong, that's an issue for summary

11   judgment, but it's not an issue for striking -- certainly isn't

12   an issue for them unilaterally withholding discovery that was

13   ordered by the Court.

14        MR. VANHOUTAN:  Your Honor, I'm not sure I agree with

15   counsel's math.  So here are the numbers for Mediatek.  The

16   accused products that charted versus totally accused and

17   uncharted.  Six products charted versus 99 accused.  And when I

18   say accused, I mean listed by name only.  For Broadcom, one of

19   48.  NXP, three of 381.  Qualcomm, six of 96.

20        If you go to the complaint, they identify a number of ARM

21   cores that they say meet this claim limitation, yet they only

22   charted one.  They took the one they liked.  They took the ETM

23   version they liked and they charted that one and then they

24   identified the products that have that one and then they just

25   identified by name the products that have other ARM

1   architectures and used other ETM versions.

2       When I say prove it, I mean give me a chart that shows how

3   you're reading this on these other ARM architectures and other

4   ETM versions and we'll give you the documents, but you've got

5   to do Step A before we have to do Step B so we can all do Step

6   C which is claim construction.

7       Now, we haven't had this information.  We've had to just

8   identify from one ARM architecture and ETM version what we

9   think the disputes are in the claim terms and try to come up

10  with constructions from there, but we've been deprived of this

11  information since then and we have to have that information

12  from plaintiff before we can -- before we should be obligated

13  to give them all this technical information.

14      THE COURT:  So your position is the product that is being

15  accused of infringement from your folks is ARM core

16  architectures?

17      MR. VANHOUTAN:  I don't know that that's a dispute between

18  the parties.  I mean, Mr. Harrington said it.  I think what is

19  being accused is ARM core architectures in all the products.

20      THE COURT:  So I'm asking you --

21      MR. VANHOUTAN:  Oh, I'm sorry.

22      THE COURT:  I'm trying to come up with a -- with what you

23  think is being accused, and you would say it's ARM core

24  architectures.

25      MR. VANHOUTAN:  Yes.  And the ETM software functionality

1    that's within those ARM core architectures.

2        THE COURT:  Okay.  And so you would take the position that

3    the plaintiff has to provide to you infringement contentions

4    for each distinct ARM core architecture?

5        MR. VANHOUTAN:  Yes.  And ETM version.

6        THE COURT:  And each ETM version.

7        MR. VANHOUTAN:  Yeah.  And the issue there is, as we told

8    them when we were trying to work this out amongst ourselves is,

9    you know, you're accusing something in this Version 4.0 that

10   wasn't implemented in 3.5 and below.  So we need to know how

11   you're reading this on the other ETM versions or if you are.

12       THE COURT:  And your point being that -- I don't know

13   enough about these patents, but your point is that for example

14   if they were to say six different versions of the ETM -- six

15   different versions of the ARM architectures because of

16   different ETM software on the architecture it might be -- it

17   might be your position that there's no way all those could

18   infringe --

19       MR. VANHOUTAN:  That would be our position.

20       THE COURT:  -- because they're different and you want to

21   put the plaintiff to the test of saying either ARM core

22   architecture with ETM software Version 1 does and we're not

23   accusing the other ones or we are accusing all 12, but they've

24   got to tell you why they're accusing all 12 because that will

25   help frame up what the -- how they're -- how they are applying

1    the claim terms to your cause.

2         MR. VANHOUTAN:  Exactly.  I would only add one caveat in

3    that the ARM architectures are different themselves.

4         THE COURT:  So --

5         MR. VANHOUTAN:  So you --

6         THE COURT:  You would want -- okay.  So you would want

7    infringement contentions for any accused ARM core -- any --

8    each of the different versions of any accused ARM core

9    architecture and then with each -- within each one of the ARM

10   core architectures you would want infringement contentions for

11   each version of those as they might change based on the

12   different ETM software that operates them?

13        MR. VANHOUTAN:  That they are accusing.  Yes.

14        THE COURT:  That they're accusing.

15        So now turning to plaintiff's counsel, that doesn't sound

16   unreasonable to me.  Why should you not have to chart

17   infringement contentions for each of the different ARM core

18   architectures?

19        MR. THOMPSON:  So, Your Honor, the reason why we shouldn't

20   have to do that is a reason that many courts have stated when

21   you're -- when dealing with similar situations.  The vast

22   majority of the accused products, our theories are not -- I'm

23   sorry.  Our theories of infringement are the same for all the

24   accused products.  The differences that they're identifying as

25   somehow showing that having a common infringement chart is

1    insufficient only apply to a small subset of the products.  So

2    if there's -- if there's any supplemental charting that was

3    needed, it would only be for the subset of things that are

4    actually affected by the theories that defendants have given

5    because they've given no reason to even think that the other

6    architectures are different.  For example, you know, there's a

7    Version 3.5 and a Version 4.0 of the ETM functionality.  They

8    have identified no differences at all in how those function.

9    So there's no reason why those two architectures should be

10   charted differently.

11       THE COURT:  So going back to you now.  If they tell you --

12   if I were to require them to tell you formally that the

13   infringement -- if I were to have them, the plaintiff, say,

14   with regard to the following different ARM core architectures

15   and with regard to the -- with -- and for each one of those

16   with regard to that -- the different ETM software that applies

17   to those, you can accept that these infringement contentions

18   apply to those, then wouldn't the plaintiff be stuck even if

19   they were wrong?  Does that make sense?

20       MR. VANHOUTAN:  I'm not sure I follow, Your Honor.

21       THE COURT:  Well, here -- if they are going to state on

22   the record that the -- for example as he just did, that their

23   infringement contentions can apply to both, one in the ARM core

24   architectures that has Version 3.5 and Version 4.0, I don't

25   know that they need to -- I don't know that they need to do a

1   separate one if they're on that record, but if you came back in

2   then and said that they are different and in substantial ways,

3   then that would be -- it seems to me that would be good for

4   you.

5       MR. VANHOUTAN:  So a couple of comments, Your Honor.  I

6   mean, when -- when I had a conversation on the phone with

7   counsel, and it's not like we laid behind the log here and

8   waited until August 30th and said, oh, we're only going to give

9   them this.  I called them immediately.  I said, let's -- you

10  know, let's see if we can find a way to work this out.  We

11  threw out some ideas, and counsel told me, look.  If -- we

12  think these are the same, and if they're not, we want to know

13  that.  And I said, well, look.  I can't really marshal

14  evidence, you know, outside of discovery to you guys and -- but

15  I'll try to find an example and show you where you're reading

16  this wrong and then, you know, maybe we can have a discussion

17  and we found an example.  One example of, here's a way you're

18  reading this for one architecture for one ETM version that

19  doesn't apply to another.  And here's some public documents

20  where you could have found this.  Okay.  Do you want to talk or

21  are we still -- are we at impasse?  We're at impasse.  So that

22  was just one example.  I think what counsel's asking us to do

23  is provide noninfringement charts which it's not obligated.

24  What we want to see is how are you -- if you say they're

25  materially the same, okay.  Great.  There's different

1    architectures that are identified in their complaint from ARM.

2    Show me how you're reading the same claim on these different

3    architectures and different ETM versions.  That's what you're

4    obligated to do in the scheduling order and that's what we want

5    to see.  And again I'm not saying you have to do it for every

6    product, but you have to do it for every ARM architecture and

7    ETM version that's accused.

8         THE COURT:  And how many of them are the -- how many

9    different ARM architectures are there if you take all the

10   different ETM versions?

11        MR. VANHOUTAN:  So this is our math of the products they

12   just listed by name and we went and checked what ARM

13   architectures they use.  25 different ARM architecture cores

14   and six different versions of ETM.

15        THE COURT:  And so it would be six times 25?

16        MR. VANHOUTAN:  You know, maybe a specific ARM core

17   doesn't use all versions -- didn't use all versions or doesn't,

18   you know, so it's something -- that would be the outer banks

19   and then it could be something less than that.

20        MR. THOMPSON:  Your Honor, I would just make I think one,

21   you know, very clear point in terms of what defendants are

22   obligated to give us now even under their theories.

23        THE COURT:  Okay.

24        MR. THOMPSON:  The charts that we used, the charts that we

25   provided, again, theories apply to every product, but the

1  evidence we used was from ETM Version 4 and a particular ARM

2  core.  And just those two categories alone if you picked every

3  product we've accused that's in Category 4 of ETM, that's 251

4  products, right?  I mean, that's nearly half the accused

5  products.  So whatever we do in terms of giving the defendants

6  more information, it should not have delayed and it shouldn't

7  further delay their obligation to give us the product

8  information for things that they haven't said worked

9  differently, which is the vast majority of the accused

10 products.  And then beyond that, I don't know that --

11      THE COURT:  Well, let me stop you there.

12      MR. THOMPSON:  Sure.  Uh-huh.

13      THE COURT:  Is there any common ground on which -- can the

14 defendants tell from the infringement contentions they've

15 received, is there a quantum of products that is clearly

16 covered by those infringement contentions?

17      MR. VANHOUTAN:  Yes.  And they have identified those for

18 us.

19      THE COURT:  Right.

20      MR. VANHOUTAN:  So they said ARM Architecture A -- I'm

21 sorry.

22      Is it 53 or 57?  I can't remember.

23      MR. THOMPSON:  53.

24      MR. VANHOUTAN:  And then ETM 4.  And they've identified in

25 the chart here are the products, for example Qualcomm, that

1   have those.  And then they've identified by name, you know, 300

2   other products that don't have those.

3        THE COURT:  Okay.  Stick with me.  So there is a quantum

4   of products that you can provide information?

5        MR. VANHOUTAN:  We have produced that information.

6        THE COURT:  Okay.  So this is over -- and so this is over

7   the products that you say you don't have infringement

8   contentions?

9        MR. VANHOUTAN:  Exactly, Your Honor.

10       THE COURT:  Okay.

11       MR. THOMPSON:  Your Honor, I would direct your attention

12   to the second tab of the binder I've given you which is Exhibit

13   17, and if you turn to the third page of that and then the

14   fourth page, you'll see what's going on here.

15       So what we did on the first page on Page 3 is sort of

16   given an overview of our infringement theories and what we're

17   going after which are, you know, these Qualcomm devices with

18   this, you know, particular functionality.

19       Right after that we gave a couple of examples of products

20   literally just, you know, giving some links of some pictures

21   that show examples of some products that fit under this theory.

22   And, again, we were very clear that the ETM 4 was an exemplary

23   theory and we thought all the products worked materially the

24   same.

25       We then provided a chart, the appendices I think Your

1    Honor saw earlier, that listed every product that we said was

2    covered by that chart and gave similar links for those

3    products.  So the idea that we're just limited to the 16

4    exemplary things that preceded the chart makes no sense

5    whatsoever.  I mean, at most we could be limited to things that

6    use the same type of evidence as what we put in the chart which

7    again would be nearly half the accused products.  The 16

8    charted product theory they have is incoherent.

9         MR. VANHOUTAN:  Your Honor, I mean, the issue with that is

10   all of the products -- the products they didn't chart they

11   don't have the A53 architecture core.  They don't necessarily

12   use the ETM Version 4.  That's the distinction.  What they want

13   from defendants is every document relating --

14        THE COURT:  No.  I've got it.

15        MR. VANHOUTAN:  And they --

16        THE COURT:  Yeah.  So they chart -- so they charted the

17   ARM Cortex A53.

18        MR. VANHOUTAN:  Correct.

19        THE COURT:  And have you all produced to them all the

20   information that you were supposed to with regard to any

21   product that had the ARM Cortex A53 in it?

22        MR. VANHOUTAN:  Nonconfidential information.

23        THE COURT:  Yes.

24        MR. VANHOUTAN:  Yes.

25        THE COURT:  Okay.  And so -- and your position is if there

1   is a different ARM product -- I'm just making this up -- ARM

2   Cortex A59.  If they didn't -- if they didn't chart -- if they

3   didn't give you infringement contentions for that, you did not

4   respond with information about products that had a different

5   non --

6       MR. VANHOUTAN:  A53.

7       THE COURT:  A53.

8       MR. VANHOUTAN:  Correct.

9       THE COURT:  Okay.  So what I'm not tracking here is

10   plaintiff's counsel is saying they gave you information for at

11   least half the products.

12       Is that what you just said?

13       MR. THOMPSON:  So I was just saying, Your Honor, the -- if

14   you turn to the next couple of pages, you'll see where the

15   actual charts begin.

16       THE COURT:  Yeah.

17       MR. THOMPSON:  So these are the exemplary sort of products

18   that we used up front, and then -- so in the actual charts

19   where we're mapping claim elements to theories, the evidence in

20   the pictures there are drawing from things that talk about the

21   ETM Version 4 more generally and then the A53 in particular.

22   Right?

23       And, Your Honor, I mean, I don't think we have any

24   objection to providing charts that are ETM version based to the

25   extent the defendants have identified differences between ETM

1   versions.  I don't think defendants have identified any reason

2   why different cores, you know, the A53 or the A57 that use the

3   same ETM version operate differently.  So I don't see any

4   reason for a core based charting.  I think that's just, you

5   know, extra work that doesn't give them any more information

6   about our theories.

7        THE COURT:  So your position is all of the cores, if they

8   are A53 -- ETM Version 53 operate the same for purposes of

9   infringement?

10       MR. THOMPSON:  Yes.  That's the first level of it, and our

11  other theory right now is that any other core that uses ETM

12  Version 4 also operates the same.

13       THE COURT:  Sure.  I get that.

14       MR. THOMPSON:  Right.  And we're happy to do that work to

15  provide more information on those ETM versions that defendants

16  say are different and show that they are different in some way,

17  but it shouldn't delay their obligation to give us the

18  production and the financial information on all the products,

19  because, again, their complaints, even if they are accepted and

20  even if they resulted in the Court striking the claims that,

21  you know, have this issue from the case, we still have 17

22  claims that cover all 600 products and for which they've

23  identified no difference in operation.

24       MR. VANHOUTAN:  May I, Your Honor?

25       THE COURT:  Uh-huh.

1          MR. VANHOUTAN:  We're not obligated to identify the

2     differences.  They are obligated to chart the accused products

3     and show us how they're reading the asserted claims on the

4     accused products.  They did that for one set of products.  The

5     A53 Cortex with the ETM Version 4 and those products of

6     defendants that have that ETM version.  In their complaint at

7     Page 21 through 27 they say, now, look at all these ARM cores:

8     ARM Cortex A57, ARM Cortex A17, ARM Cortex 53, which they

9     charted, ARM Cortex A72, ARM Cortex A8.

10          If you look at Page 3 of 33 right there in that very --

11     right there in that tab that you're on, look at all these ARM

12     cores that they identify.

13          THE COURT:  Okay.

14          MR. VANHOUTAN:  These are not the same technically.  They

15     don't have the same design.  They don't have the same

16     functionality.  The ETM versions don't have the same design

17     functionality.  So if they want to accuse all those, I fully

18     appreciate that.  I need to see how you're reading these claims

19     on disparate architectures with different ETM versions.  And

20     you don't have to give me a chart for every product that

21     contains those cores, but every core you want to accuse,

22     because they're different, you need to show us how your

23     infringement read is or else you're giving an advantage.  The

24     advantage is you want all the documents so you can sit with

25     them and figure out how you're going to read these claims on

1  all these disparate products and go through claim construction

2  and you want to hide your -- you know, your allegations from

3  us.  So we're disadvantaged.  If they want to show that

4  those -- if they want to accuse those, great.  Provide a chart.

5  I mean, that's really what it comes down to.

6      THE COURT:  So how many different ETM versions here -- I'm

7  looking at Page 3 of 33 of this.  I see ETM Version 4.2,

8  Version 4 and Version 3.5.  Are there other ETM versions than

9  that?

10      MR. THOMPSON:  Your Honor, I think the number of six that

11  Mr. VanHoutan gave is roughly accurate.  I mean, I think you

12  could talk about ETM Version 4 or higher, an ETM Version 3.5.

13  There's Versions, you know, 1, Versions 2 and Version 3 like I

14  said are less than 3.5.  I think that would be six categories.

15      THE COURT:  Okay.  So here's what I'm going to order that

16  the plaintiffs do.  You need to provide infringement

17  contentions to the defendants with respect to just -- we're

18  going to start this way and we'll figure out if it's enough

19  later, but with respect to one of the cores.  You've done A5,

20  correct?

21      MR. VANHOUTAN:  A53.

22      MR. THOMPSON:  A53.  Yes.

23      THE COURT:  A53.  You need to provide to the defendants

24  infringement contentions with regard to the core A53 with

25  respect to each of the different ETM versions that there are.

1      MR. THOMPSON:  Well, the A53 uses 4.0.  So, I mean, what

2   we could do is part of the chart for another version we could

3   find another core that uses, you know, the different version.

4   So we could maintain a similar format on a per ETM version

5   basis and sort of link it to one of the particular cores that

6   uses that particular ETM version.

7      THE COURT:  So where I'm going to split the baby here is I

8   want you to provide an infringement -- a set of infringement

9   contentions for each ETM version of at least one core to the

10  defendants.  And how long will that take you?

11     MR. THOMPSON:  You know, I'd have to talk to my --

12     THE COURT:  A week?  Two weeks?

13     MR. THOMPSON:  Take two weeks probably.

14     THE COURT:  Two weeks?  Once you get those done in two

15  weeks, then -- and you provide those, then the defendants will

16  have their -- they will complete their obligation of getting

17  you the information with regard to each of the products.

18     MR. THOMPSON:  And this will be each of the accused

19  products, you know, the larger list?

20     THE COURT:  That's right.

21     MR. THOMPSON:  Okay.

22     MR. VANHOUTAN:  So, Your Honor, that's not just the list

23  for which they provided the document claim charts.  That's all

24  the products they identify even if it's not charted?

25     THE COURT:  With regard to sales information it'll be with

1    regard -- yes.

2         MR. VANHOUTAN:  What about technical information?

3         THE COURT:  I thought it was non -- is it -- I thought it

4    was non technical information at this point.  It is technical?

5         MR. VANHOUTAN:  It's sufficient to show documentation.

6         MR. THOMPSON:  Exactly.

7         MR. VANHOUTAN:  And summary sales information for two

8    years.

9         THE COURT:  I do want summary sales information.  If the

10   defendants produce technical information with regard to just

11   those products that you chart, will that be sufficient for you

12   all to get -- that should be sufficient for you all to get

13   through the Markman?

14        MR. THOMPSON:  Markman.

15        THE COURT:  Right?

16        MR. THOMPSON:  Yeah.

17        THE COURT:  So let's do that.

18        MR. VANHOUTAN:  Okay.

19        THE COURT:  And I know what I just said, but I want to

20   make sure that you both understood what I just said before you

21   leave.

22        MR. THOMPSON:  Yes, Your Honor.

23        THE COURT:  Do you think you know what I meant?

24        MR. THOMPSON:  I do, Your Honor.  Yes.

25        MR. VANHOUTAN:  So technical documentation for the

1    products for which they provide charts and summary sales

2    information for all the products they identify?

3        THE COURT:  Correct.

4        MR. THOMPSON:  Your Honor, there is sort of I guess a

5    related issue.  Lenovo has not produced any technical documents

6    even for the 16 or so subset that Mr. VanHoutan talked and so I

7    think we have to resolve that.  Their position appears to be

8    that while their motion to dismiss is pending and while the

9    motion for reconsideration is pending, they're not obligated to

10   provide any discovery.  I think it would be helpful to get

11   some, you know, guidance from the Court on that issue.

12       MS. YIP:  Your Honor?

13       THE COURT:  Yes, ma'am.

14       MS. YIP:  Your Honor, this is Lai Yip of Sheppard, Mullin

15   speaking on behalf of Lenovo defendants.  We were not expecting

16   or planning to argue this motion for reconsideration today, and

17   that's really what this issue is about that Mr. Thompson has

18   raised is whether or not there is an obligation to participate

19   in merits discovery in view of the failure of services before

20   us and we were not expecting or planning to argue this motion

21   today based on written correspondence with the Court.  We of

22   course would answer whatever questions the Court has regarding

23   the motion, but we would request that if the Court is inclined

24   to hear or lodging another motion that we be given a full

25   opportunity to prepare and have full time.  There's only

1    about -- there's not that much time left in the hearing time

2    that has been allotted, and, you know, we would -- we would

3    want to have the full time to argue this extremely important

4    motion.

5         THE COURT:  Yeah.  We're not going to take this up now.  I

6    think where we're headed probably is Lenovo will probably be on

7    a slightly different track than the other folks once we get the

8    jurisdictional issue.  However, you know, let me make very

9    clear if the Court ultimately determines that Lenovo is going

10   to be part of the case -- I have no idea what I'm going to do

11   yet, but if we do, whatever shortage of time Lenovo has to

12   participate in the preparation of the contribution to which

13   claim terms are going to be construed and all the other, we've

14   got to get these resolved before -- we've got to get the issue

15   of whether Lenovo belongs or not resolved in time to get

16   Lenovo -- you're going to be part of the Markman hearing.  And

17   so -- one way or another.  I'll be getting an order out today.

18   I'll put on the record what's going to be in the order which is

19   that I'm very concerned about the delay that I think Lenovo has

20   injected into the case, that Lenovo's counsel has injected into

21   the case.  That will be reflected in the order.  I don't

22   appreciate the way so far Lenovo's counsel has conducted

23   themselves in the case with the delay that they, I feel, are

24   intentionally injecting.  That will be set out more fully in

25   the written order.  For example, you know, the number of

1    pleadings that have been filed, the delay in getting them

2    filed, taking a full 28 days to get something raised with the

3    Court on -- for reconsideration.  All of that is not

4    appreciated and so I'm going to take all that into

5    consideration as we move along.  If Lenovo does wind up staying

6    in the case with respect to any issues that Lenovo raises with

7    about their ability to fully participate in the Markman

8    briefing.  So, in other words, it's going to be -- I'm probably

9    going to find that Lenovo has made their own bed and they will

10   get to sleep in it.  So I want all that on the record now.  I'm

11   not going to take this issue up now, but we'll just -- you

12   know, we'll get the Lenovo issue, which is separate, on

13   jurisdiction resolved as quickly as you all get me evidence we

14   can resolve it on.  I'm very frustrated by the failure to have

15   that information.  I'm frustrated at not being able to get that

16   motion resolved more quickly, and -- but we're going to keep

17   moving along.  If I have to adjust other things in the case

18   because of this issue, I probably will do it, but -- because

19   I'm going to remain fair to all the parties.  I certainly hope

20   I don't have to adjust the date for the Markman to accommodate

21   that.  I will if I have to, which will -- you know, which will,

22   you know, prejudice all the other parties.  It's not a problem

23   for the Court.  I'll do it when I need to, but I want everyone

24   that's here and on the phone call to understand I will be

25   paying very close attention to this case and we're going to

1    keep it moving.  And so -- and y'all will have an order

2    today -- I think it's done.  I assume it will be signed

3    today -- with respect to Lenovo's motion that -- one of the

4    motions that's currently pending.

5         Is there anything else we need to take up?

6         MR. THOMPSON:  Not for plaintiffs, Your Honor.

7         MR. VANHOUTAN:  Not from the defendants.

8         THE COURT:  Anything from Lenovo?

9         MS. YIP:  Well, we just want to assure the Court that we

10   don't -- well, in terms of the timing of the motion and we

11   understand Your Honor's concern, but we absolutely did file

12   that motion as soon as we possibly could, given all of the

13   interests that were at stake, and in terms of the timing on

14   claim construction, we certainly appreciate that.  We would not

15   want there to be any prejudice to the parties with respect to

16   claim construction.  And in terms of how the motion for

17   reconsideration is cited, we certainly will keep that in mind

18   and we certainly don't want there to be any undue delay with

19   respect to that.

20        THE COURT:  Well, I appreciate what -- your words, but

21   I -- let me make sure you understand.  I think there already

22   has been delay and I'm going to do everything I can to make

23   sure that it doesn't prejudice the case going forward.

24        So thank you all.  Have a good day.

25        MR. THOMPSON:  Thank you, Your Honor.

1          MR. VANHOUTAN:  Thank you, Your Honor.

2       (Hearing adjourned at 11:25 a.m.)

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10   United States.

11      Certified to by me this 22nd day of September 2019.

12

13                        */s/ Kristie M. Davis*
                             KRISTIE M. DAVIS
                             Official Court Reporter

14                              800 Franklin Avenue, Suite 316
                             Waco, Texas 76701

15                              (254) 340-6114
                             kmdaviscsr@yahoo.com

16

17

18

19

20

21

22

23

24

25